FILED
COURT OF APPEALS
DIVISION II

2014 MAR 25 AM 8:50

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CITY OF VANCOUVER, a municipality, | No. 43641-8-II |
| Appellant, | PUBLISHED OPINION |
| STATE OF WASHINGTON PUBLIC EMPLOYMENT RELATIONS COMMISSION; VANCOUVER POLICE OFFICERS GUILD, | |
| Respondents. | |

BJORGEN, J. — The Public Employment Relations Commission (Commission) found that the city of Vancouver (City) committed an unfair labor practice by discriminating against Vancouver Police Officers' Guild (Guild) president Ryan Martin out of animus over his union activities. The City appeals, contending that the Commission (1) improperly applied judicial precedent to the Guild's discrimination complaint; (2) violated the Administrative Procedure Act (APA), chapter 34.05 RCW, by engaging in improper rulemaking; and (3) based its decision on factual findings unsupported by the record.

We hold that RCW 41.56.030(12) and RCW 41.56.160 show legislative intent to allow the Commission to impose liability on individuals for unfair labor practices, but that the Commission's order did not impose personal liability on Police Chief Clifford Cook. We hold also that the Commission applied an improper burden of proof in determining the City's liability, but that this error was harmless because the Commission's findings show that the City committed an unfair labor practice when judged under the proper burden of proof. We conclude

further that Martin suffered an adverse employment action when the City decided not to transfer him to the motorcycle unit. Finally, we conclude that the Commission's order was not an exercise of rule-making authority and that the Commission's findings of fact are supported by substantial evidence. For these reasons, we uphold the Commission's order.

## FACTS

In April 2007, the City hired Cook as its chief of police. Cook is a devotee of the community policing theory and planned to reorganize the police department consistently with it. In 2008 a budget crisis forced a departmental hiring freeze that created shortages in the number of police officers assigned to basic patrol duties. To remedy these shortages, Cook eliminated several specialty units within the department, including its motorcycle unit, and transferred the officers from these units back to patrol.

In spring 2009, the department revived the motorcycle unit in a smaller form consisting of two officers and two supervisory personnel. To expedite the revival, departmental officials limited the pool of candidates for the officer positions to those that had served in the unit previously, officers Martin, John Davis, Scott Neill, and Ken Suvada.

Shortly after Cook became police chief, Guild members elected Martin as the Guild's new president. Guild members "had perceived the Guild to be a little passive in the past, and they wanted more of an aggressive stance" by their new president. Administrative Record (AR) at 467-68. In the months between Martin's election to the Guild's presidency and the selection of the officers for the motorcycle unit, Martin challenged the police department's leadership on behalf of the Guild's members on several different occasions, filed grievances against the

department for Guild members, and exercised Guild members' rights under the collective bargaining agreement (CBA) to block Cook's attempts to reorganize the department.

The motorcycle unit selection panel interviewed the officer candidates just days after one of Martin's assertions of Guild rights to block one of Cook's proposed policy changes. Three panel members, Assistant Chief Chris Sutter, Lieutenant Amy Foster, and Corporal Robert Schoene, met individually with Davis, Martin, Neill, and Suvada. The interviewers received the applicants' letters of interest, resumes, performance evaluations, and a leave usage spreadsheet for the previous two years, along with any letters of support from supervisors. The leave usage spreadsheet included a field called "other" leave, which only Martin used. Exh. 27. This leave included that granted to the Guild's president for union business under the CBA.

After the interviews, the panel was to recommend the best qualified candidates to Cook, who retained the ultimate authority to staff the unit. The panel unanimously selected Neill and rejected Suvada. The choice for the second position came down to Martin and Davis. Sutter and Foster preferred Davis. Schoene, who had supervised the two men in the old motorcycle unit and who would serve as the supervising corporal in the reformed unit, preferred Martin.

In discussions Schoene explained that he preferred Martin because, given the small size of the new unit, "[Martin] brought the most skills and . . . connections within the City." AR at 653. One factor for determining the best qualified candidates was "[t]he employee's ability to perform the specific technical skills required" for the assignment. Exh. 56 at 1. Schoene noted that Martin had frequently testified in court, qualified as an expert witness in driving under the influence cases, and had received certification as a drug recognition expert and a technical collision investigator. None of the other candidates possessed these qualifications, and Schoene

explained that Martin's skills would best serve the reconstituted unit's primary mission of traffic enforcement.

Sutter responded that "the person with the most skills and qualifications is not always the best fit for the unit." AR at 654. Instead, Sutter declared that the panel was "looking for someone that is–supports the Chief's vision and the Chief's direction." AR at 654. Schoene replied that "at my level in dealing with Officer Martin, he's always in his work, he has always portrayed a positive image of the Department." AR at 654. Schoene added that he could "understand if that's an issue at [Sutter's] level in the decision-making but at my level, [Martin] portrays that he supports the Chief in his everyday interaction with citizens as we perform our duties." AR at 654. Sutter did not respond.

Schoene later brought up Martin's leave usage as a possible weakness for his candidacy, noting that Martin took blocks of flex time and vacation to visit his children in Arizona for extended periods. Martin's supervisors had noted this habit in his reviews, but each had also stated that he was an extremely hard worker and recommended him for promotion. Schoene admitted that, with the smaller unit, Martin's leave habits might present an issue. Schoene reiterated, however, that he would select Martin over Davis, although, under pressure from Sutter, Schoene allowed that Davis would also be a good fit. Sutter, for his part, commented in his notes about the interviews that Schoene recommended Neill, but did not note Schoene's recommendation of Martin.

Neill had leave issues of his own. The spreadsheet providing the applicants' leave usages showed that he used the most leave of any candidate in 2008. However, Schoene explained that Neill had taken time off to care for a chronically ill family member and had made arrangements

4

that allowed him to work full time in 2009. The police department's leadership was aware that Neill's leave usage would return to levels much higher than Martin's if this alternate care disappeared.

Foster and Sutter considered Martin's time away from his unit while performing other departmental tasks as a detriment to his candidacy. However, neither Foster nor Sutter considered Davis's absence from his primary duties to fulfill his other roles in the department a detriment to his application.

The day after the interviews, Sutter contacted Pat Johns, who had just been chosen to fill the sergeant's position in the motorcycle unit, to discuss the choice between Davis and Martin. Johns, like Schoene, had supervised both officers in the old motorcycle unit, and he recommended Martin for the same reason given by Schoene, that Martin's skills would provide a "crucial component" of a "successful team." AR at 631. When Sutter asked about Martin's leave use, Johns acknowledged it could be an issue, but he assured Sutter that he could work with Martin to minimize any problems and continued to recommend Martin.[1] No one told Cook about Johns's recommendation until after Cook had made the decision to deny the position to Martin.

Sutter gave Cook the panel's recommendations, unanimously endorsing Neill for a position, but splitting two votes to one in recommending Davis over Martin for the second position. Sutter explained that he and Foster voted for Davis due to concerns about Martin's pattern of absences from his unit. Cook, though, was adamant that any consideration of Martin's

---

[1] Sutter and Foster both testified that Johns changed his recommendation to Davis after becoming aware of Sutter's concern over Martin's leave. Johns denied this and the examiner credited Johns's testimony.

absences exclude his union leave. Sutter also passed along a warning from Schoene that a decision not to select Martin would create problems. After reviewing the panel's notes, Cook met with Sutter and Foster and selected Neill and Davis for the motorcycle unit. Later, Cook explained to Schoene that he simply counted votes: Neill had three, Davis had two, and Martin had only one.

After Cook's decision, the Guild filed an unfair labor practice complaint against the City. The complaint alleged that the City had "interfered with, restrained, coerced and discriminated against Officer Martin in violation of RCW 41.56.040 and RCW 41.56.140(1)" by denying him the motorcycle unit assignment. AR at 3. The Guild and the City contested these claims before a hearing examiner.

The hearing examiner found that the City had "discriminated against Martin because of his protected activities and interfered with employee rights in violation of RCW 41.56.140(1)." AR at 1233. The examiner found that Sutter offered pretextual reasons for selecting Davis over Martin to cover his anti-union bias based on three pieces of evidence. First, Sutter's statement about selecting someone who supported Cook's vision for the department, rather than the most qualified, betrayed anti-union animus. Sutter made this statement near in time to Martin's challenges to the department's leadership on behalf of the Guild's members and his assertion of their CBA rights to thwart Cook's plans for the department. Given this context, the examiner found that Sutter made the comment to suggest that the panel should reject Martin's candidacy because of his Guild activities. Second, Sutter selectively used or disregarded statements of support by Schoene and Johns to buttress the case for Davis, when both men, in truth, supported Martin. Finally, the examiner noted that Sutter considered Martin's absence from his unit to

fulfill his other departmental duties a detriment to his candidacy, but did not find Davis's absences for identical reasons to be problematic.

While the examiner found animus on Sutter's part, she found Cook possessed no animus of his own. Nonetheless, the examiner found that Cook had made his decision by simply counting the votes on the interview panel for each candidate. Sutter's vote thus determined the denial of the position to Martin. Because Cook used files shaped by Sutter to perform his own review, the examiner found that Cook's independent investigation had not broken the causal chain between Sutter's animus and the unfair labor practice. The examiner explained that

> [t]he linchpin in this case is Cook's reliance on the recommendation he received from Sutter. Although Cook took steps to verify the information he was being provided, his ultimate decision was colored by Sutter's representation of the facts. Thus, the decision not to offer Martin one of the two [m]otor[cyclist] [o]fficers positions was discriminatory.

AR at 1228-29

The examiner's order required "[t]he City of Vancouver" through its "officers and agents" to "immediately . . . remedy its unfair labor practices." AR at 1234. The remedial steps included offering Martin a position in the motorcycle unit.

The City appealed the examiner's decision and order to the Commission. The Commission affirmed the decision, adopting the examiner's findings, conclusions and order as its own, but it reversed the decision that Cook had no animus. The Commission declared that it would hold decision makers like Cook "strictly liable" for the animus of subordinates, using its interpretation of the subordinate bias theory of liability found in *Staub v. Proctor Hospital*, ___ U.S. ___, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011), which had issued after the examiner's

decision and order. AR at 1382, 1394-97 & n.6. Based on this interpretation, the Commission

declared that

> where an employment decision is influenced by the union animus of a subordinate or advisor to the decision maker, the decision will be found discriminatory, and a remedial order will be issued unless the respondent can demonstrate that the decision maker independently reached the same conclusion free from union animus.
>
> In cases such as this, a respondent will not be found in violation of Chapter 41.56 RCW if it demonstrates that the decision was made completely free from the recommendation of the subordinates who displayed union animus. However, once a subordinate has made a recommendation to a decision maker that has been tainted by animus, it is not enough for the decision maker to say the decision was made independently. Credible evidence must exist that demonstrates that the decision maker purged from the decision making process the discriminatory recommendation.
>
> Applying these principles to the case before us, the record clearly demonstrates that Cook relied upon the tainted recommendation of Sutter when making his decision. Although Cook testified that he considered selecting Davis over Martin, Schoene testified that Cook stated he simply counted the votes of the members of the interview panel to make his final decision. The Examiner found Schoene's testimony credible. Furthermore, the record demonstrates that Cook reviewed the notes of the interview panel, but did not conduct an independent review of the applicants.
>
> Because Cook relied upon the recommendation of Sutter and failed to conduct an independent review free from union animus, Cook, as the final decision maker, is held liable under Chapter 41.56 RCW. The Examiner's decision is affirmed.

AR at 1382, 1396-97. However, because the Commission adopted the examiner's order as its

own, it imposed no individual penalties on Cook.

The City sought judicial review of the Commission's decision and order, moving for

direct review by this court. The Clark County Superior Court certified the appeal and our

commissioner accepted the City's petition for discretionary review.

ANALYSIS

In its appeal the City urges that the Commission erroneously applied the subordinate bias theory of liability found in *Staub*, improperly engaged in rulemaking with its order, and that three findings made by the examiner and adopted by the Commission are not supported by substantial evidence in the record. Before turning to these contentions, we briefly review the Commission's authority and the standard of review on appeal.

I. COMMISSION'S AUTHORITY AND STANDARD OF REVIEW

RCW 41.56.040 protects public employees' rights found in chapter 41.56 RCW from "interfere[ence] . . . , restrain[t], coerc[ion], or discrimin[ation]" by their employer. Implementing these protections, RCW 41.56.140(1) makes it an unfair labor practice for an employer to "interfere with or discriminate against" employees exercising the rights protected by chapter 41.56 RCW. *City of Federal Way v. Pub. Emp't Relations Comm'n*, 93 Wn. App. 509, 512, 970 P.2d 752 (1998) (citing RCW 41.56.140(1)).[2]

The legislature "empowered and directed [the Commission] to prevent any unfair labor practice and to issue appropriate remedial orders." RCW 41.56.160(1). The Commission's remedial powers include the ability to issue "cease and desist" orders to any "person [that] has engaged in or is engaging in" an unfair labor practice. RCW 41.56.160(1), (2). The

---

[2] The Guild's complaint alleged that the City both discriminated against Martin for his exercise of protected rights and interfered with departmental employees' exercise of those rights. The examiner determined the City had committed both violations, and the Commission adopted this conclusion. The City only appeals the discrimination violation, but under the Commission's precedent the interference violation here is derivative of the discrimination violation and our decision to affirm or reverse the discrimination violation also determines the fate of the interference violation. *Yakima Police Patrolmen's Ass'n v. City of Yakima*, 153 Wn. App. 541, 566, 222 P.3d 1217 (2009) (quoting *Kozlowski v. Clark County*, No. 18682-U-04-4748, 2007 WL 4111397, at *10 (Wash. Pub. Emp't Relations Comm'n Oct. 10, 2007).

No. 43641-8-II

Commission may order other relief, "such as the payment of damages and the reinstatement of employees," where doing so "will effectuate the purposes and policy of [chapter 41.56 RCW]." RCW 41.56.160(2).

We review a Commission decision concerning a violation of RCW 41.56.140 under the standards prescribed by the APA. RCW 41.56.165; *City of Vancouver v. Pub. Emp't Relations Comm'n*, 107 Wn. App. 694, 702, 33 P.3d 74 (2001). We review any questions of law, such as the Commission's interpretation of a statute or judicial precedent, de novo. *City of Vancouver*, 107 Wn. App. at 703. We may substitute our interpretation of the law for the Commission's, although we give the Commission's interpretation of chapter 41.56 RCW great weight and substantial deference. *City of Vancouver*, 107 Wn. App. at 703. We review the Commission's factual findings "for substantial evidence in light of the whole record, i.e., evidence sufficient to persuade a fair-minded person of their truth." *City of Vancouver*, 107 Wn. App. at 703. When performing this review, we may "not substitute [our] judgment for that of the agency regarding witness credibility or the weight of the evidence." *Thomas v. Emp't Sec. Dep't*, 176 Wn. App. 809, 813, 309 P.3d 761 (2013). Also, we consider unchallenged findings to be verities on appeal. *Campbell v. Emp't Sec. Dep't*, 174 Wn. App. 210, 215, 297 P.3d 757, *review granted*, 178 Wn.2d 1018, 311 P.3d 27 (2013).

II. SUBORDINATE BIAS LIABILITY

The City first claims that the Commission erroneously interpreted and applied the subordinate bias theory of liability found in *Staub* to the Guild's complaint. Specifically, the City contends that the Commission incorrectly read *Staub* as allowing the imposition of individual liability on Cook and allowing the imposition of liability on the City with a burden of

10

No. 43641-8-II

proof inconsistent with Washington law.[3] The City also contends that the Commission erred by applying *Staub* at all because Cook lacked knowledge of animus on Sutter's part and because Martin was not terminated, but merely denied a beneficial transfer. We hold that governing statutes allow the Commission to impose liability on individuals for unfair labor practices, but that the Commission's order did not impose personal liability on Police Chief Cook. We hold also that the Commission applied an improper burden of proof in determining City liability, but that this error was harmless.

Washington adjudicates statutory discrimination claims using the *McDonnell Douglas Corporation v. Green* framework. *See* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The complaining party first bears the burden of establishing a prima facie case of discrimination. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 67-69, 821 P.2d 18 (1991). Adapted to the context of unfair labor practices, establishing a prima facie case requires the complaining party to show that "(1) the employee has participated in protected activity or communicated to the employer an intent to do so; (2) the employee has been deprived of some ascertainable right, benefit or status; and (3) there is a causal connection between those events." *Yakima Police Patrolman's Ass'n v. City of Yakima*, 153 Wn. App. 541, 554, 222 P.3d 1217 (2009) (quoting *Pub. Sch. Emps. of Readan-Edwall v. Reardan-Edwall Sch. Dist.*, No. 12593-U-96-2997, 1998 WL 1056978, at *6 (Wash. Pub. Emp't Relations Comm'n Sept 29, 1998)).

If the complaining party makes this prima facie case, the employer may articulate a

---

[3] Amicus curiae Washington State Association of Municipal Attorneys devotes its brief to the same burden of proof issue that the City makes.

legitimate, nondiscriminatory reason for the adverse employment decision. *Wilmot*, 118 Wn.2d at 70; *Yakima Police*, 153 Wn. App. at 554 (quoting *Pub. Sch. Emps. of Reardan-Edwall*, 1998 WL 1056978, at *6). The employer bears the burden of production, not of persuasion, in offering this permissible reason for the adverse employment decision. *Wilmot*, 118 Wn.2d at 68 (citing *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 134, 769 P.2d 298 (1989)); *Yakima Police*, 153 Wn. App. at 554 (citing *Bonds v. City of Tacoma*, No. 8702-U-90-1898, 1995 WL 854141, at *11 (Wash. Pub. Emp't Relations Comm'n June 20, 1995))..

If the employer meets its burden of production for offering a permissible justification, the complaining party bears the burden of persuasion in showing that the employee's exercise of rights protected under chapter 41.56 RCW triggered the adverse employment decision. *Wilmot*, 118 Wn.2d at 70; *Yakima Police*, 153 Wn. App. at 554 (citing *Pub. Sch. Emps. of Readan-Edwall*, 1998 WL 1056978, at *6. The complainant may discharge this burden in one of two ways. First, the complainant may show that the employer's stated reason was pretextual. *Yakima Police*, 153 Wn. App. at 554 (citing *Wilmot*, 118 Wn.2d at 71-73). Second, the complainant may show that, although the employer's stated reason was legitimate, animus toward the employee's union activity "was nevertheless a substantial motivating factor" behind the employer's action. *Yakima Police*, 153 Wn. App. at 554 (citing *Wilmot*, 118 Wn.2d at 71-73).

A.    Cook's Liability

The City claims that the Commission erred with respect to Cook's liability in two different ways. First, the City maintains that the Commission lacks the power to impose liability

on individuals for an unfair labor practice because RCW 41.56.140 limits liability to employers.[4] Second, the City argues that the Commission misapplied *Staub*'s subordinate bias theory of liability to impose on Cook. We find no error on the Commission's part with regard to Cook's liability.

    1. The Commission's power to impose individual liability.

    Whether the Commission may impose individual liability under RCW 41.56.140 is a question of statutory interpretation. When interpreting a statute, we attempt to "ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). To do so, we interpret the statute's plain meaning, discerning this meaning "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11. Only where the provision is susceptible to more than one reasonable meaning after this analysis may we "resort to aids to construction" such as interpretative canons or other extrinsic evidence of legislative intent. *Campbell & Gwinn*, 146 Wn.2d at 12.

    Municipal corporations are artificial beings that can only act through their agents. *Broyles v. Thurston County*, 147 Wn. App. 409, 428, 195 P.3d 985 (2008). Recognizing this, the legislature defined a "public employer" within the meaning of chapter 41.56 RCW as "any officer, board, commission, council, or other person or body acting on behalf of any public body governed by [chapter 41.56 RCW], or any subdivision of such public body." RCW 41.56.030(12). A related provision, RCW 41.56.160(2), specifically allows the Commission to

---

[4] RCW 41.56.140 provides that "[i]t shall be an unfair labor practice for a public employer . . . [t]o interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed by this chapter."

direct various remedial orders against "any person" for unfair labor practices, and RCW 1.16.080 defines "person" to include individuals. Consequently, the plain text of RCW 41.56.030(12) and RCW 41.56.160 shows a legislative intent to allow the Commission to impose liability on individuals for unfair labor practices. The City's categorical argument that the Commission may never impose liability on individual supervisors cannot carry the field.

2. Cook's individual liability under *Staub*.

The City next contends that the Commission erred in applying *Staub* to impose personal liability on Cook because *Staub* concerned agency liability and Sutter was not Cook's agent. While we agree with the City's characterization of *Staub*, we disagree that the Commission's order imposed liability on Cook and therefore reject the City's contention.

In subordinate bias liability cases, "a biased subordinate, who lacks decision making power, uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Equal Emp't Opportunity Comm'n v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Subordinate bias liability recognizes that it does not matter whether the subordinate personally "'pull[s] the trigger'" on the adverse employment decision; the subordinate's animus sets in motion the events that culminate in the adverse employment action. *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) (quoting *Simpson v. Diversitech Gen., Inc.*, 945 F.2d 156, 160 (6th Cir. 1991)). Because the employer has delegated power or influence over employment decisions to the subordinate, any wrongful conduct on the subordinate's part occurs within the course and scope of employment. *Long v. Eastfield Coll.*, 88 F.3d 300, 306-07 (5th Cir. 1996); *Shrager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). Because the wrongful conduct occurs in the

14

course and scope of employment, we impute the discriminatory act to the agent's principal. *Thola v. Henschell*, 140 Wn. App. 70, 79, 164 P.3d 524 (2007); *Long*, 88 F.3d at 306-07; *Shrager*, 913 F.2d at 404.

We agree with the City that *Staub* would not allow the Commission to impose personal liability on Cook. Sutter lacked any agency relationship with Cook; the City, not Cook, was his principal. *See* RESTATEMENT (SECOND) OF AGENCY § 1 (1958) cmts. b, d, e (definitions of "agency," "principal," and "agent"). Because the subordinate bias theory of liability rests on agency principles, the lack of an agency relationship between Cook and Sutter would prevent the imposition of liability on Cook under *Staub*.

However, we find no intent on the part of the Commission to impose liability on Cook. We interpret an agency order in the same manner we interpret statutes. *Office of Pub. Util. Counsel v. Tex.-NM Power Co.*, 344 S.W.3d 446, 450-51 (Tex. App. 2011); *see Phillip Morris USA Inc. v. Tolson*, 176 N.C. App. 509, 515, 626 S.E.2d 853 (2006). Just as we interpret statutory provisions in light of the statutory scheme as a whole, we interpret language in an order in light of the order as a whole. *See Phillip Morris*, 176 N.C. App. at 515; *Cedar Rapids Steel Transp., Inc. v. Iowa State Commerce Comm'n*, 160 N.W.2d 825, 838 (Iowa 1968). Where an order as a whole contains contradictory language, it is ambiguous. *Phillip Morris*, 176 N.C. App. at 515-16.

The Commission's decision and order contain contradictory language about Cook's liability, creating ambiguity. The Commission adopted the examiner's order. *See* AR at 1397. The examiner's order concluded only that the employer, the City, had violated the statute, AR 1233, and required only the City to carry out any actions to remedy the unfair labor practice. AR

15

1234-35. Contrary to this holding, the Commission's order held, among other points, that "[b]ecause Cook relied upon the recommendation of Sutter and failed to conduct an independent review free from union animus, Cook, as the final decision maker, is held liable under Chapter 41.56 RCW." AR at 1397 (footnote omitted). This opposition is not reconciled by the Commission's footnote 6, which states that the examiner reached a substantially similar conclusion without relying on *Staub*.

Given this ambiguity, we must interpret the order to give effect to the Commission's intent. *See Campbell & Gwinn*, 146 Wn.2d at 9-12. We find no intent to impose individual liability on Cook for two reasons. First, we presume that the Commission knew the common law of agency underlying subordinate bias liability and the limits of that liability. *See Staub*, 131 S. Ct. at 1191-92. Even assuming that the Commission had the power to alter the limits of agency liability, we presume that it had no intent to do so without a clear, unambiguous statement of this intent. *See In re Custody of BMH*, 179 Wn.2d 224, ¶ 31, 315 P.3d 470, 478-79 (2013). The very ambiguity in the Commission's order therefore defeats any claim that it imposed individual liability on Cook. Second, we must interpret the Commission's intent from what it actually did, not just what it said. As noted, whatever language the Commission used about Cook's liability, it did not order any sanction on him in his individual capacity. Given this fact, it is difficult to discern any intent on the Commission's part to impose such individual liability. We read the Commission's order as properly limiting liability for the unfair labor practice to the City.

B.    The City's Liability

The City next argues that the Commission erred by basing city liability on the showing that Sutter's union animus "influenced" Cook's decision, claiming that this is incompatible with

the burden of proof required by *Wilmot* and similar cases. AR at 1396. The Commission answers that it may find a causal link where the employer offers pretextual reasons for the decision and notes that the examiner and the Commission found that the City did so here. We agree that the Commission applied an improper burden of proof. We affirm nevertheless because that error was harmless given the Commission's findings, which show that the City committed an unfair labor practice under the proper burden of proof.

We turn first to the Commission's argument that it could find an unfair labor practice because Sutter offered pretextual reasons for selecting Davis over Martin. We agree that Sutter's offering of pretextual reasons for recommending Davis satisfies the Guild's burden of showing that Sutter's animus caused, in part, Cook's decision. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1336-37 (11th Cir. 2013). Sutter had no need to resort to pretext unless his true reason for the recommendation was impermissible. *See Shrager*, 913 F.2d at 401.

However, the Guild's and Commission's use of subordinate liability injects new issues of causation that the finding of pretext on Sutter's part does not address. Cook made the ultimate decision at issue, and we cannot infer an impermissible motive on his part for the decision because the finding of pretext related to Sutter, not Cook. As noted, the agency principles underlying subordinate bias liability do not allow us to impute Sutter's animus to Cook. Therefore, we need to examine "the level of control a biased subordinate must exert over the employment decision" in order to impose liability on the employer. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 486-88. If Sutter's recommendation had little or no effect on Cook's ultimate decision, either because Cook disregarded the recommendation or because he independently reached his decision to deny Martin the position, we cannot say that Sutter's animus caused

17

Cook's decision, and the City is not liable for Sutter's conduct. *See Shrager*, 913 F.2d at 405. If, however, Sutter exercised the necessary control over the ultimate decision, the City bears liability for a decision caused by his animus. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 486-88.

Federal courts have determined that the necessary level of control varies based on the language of the statutory provision proscribing the discriminatory act.[5] *See, e.g., Staub*, 131 S. Ct. at 1190-91; *Sims*, 704 F.3d at 1334-37; *Simmons v. Sykes Enter., Inc.*, 647 F.3d 943, 949-50 (10th Cir. 2011); *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010). *Staub*, for example, addressed the requisite showing of control under the Uniformed Services Employment and Reemployment Rights Act, which specifically provided that "'[a]n employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership [in the armed forces] . . . is a motivating factor in the employer's action.'" *Staub*, 131 S. Ct. at 1190-91 (quoting 38 U.S.C. § 4311(c)). The Supreme Court interpreted the phrase "'is a motivating factor'" to mean that the employee must prove only that the subordinate's animus was a "causal factor" in the adverse employment decision, not necessarily a decisive factor. *Staub*, 131 S. Ct. at 1191-95 (quoting 38 U.S.C. § 4311(c)).

RCW 41.56.140 does not prescribe any specific burden of proof for showing an unfair labor practice. This is not unusual. Our Supreme Court has previously addressed statutes that forbid discrimination without prescribing the appropriate burden for proving a causal link between protected activity and the adverse decision. *See, e.g., Wilmot*, 118 Wn.2d at 55, 70-73. In these cases the Supreme Court turned to public policy considerations to choose the

---

[5] Admittedly, the federal courts have split over the requisite level of control, even when interpreting the same statutory language. *See BCI Coca-Cola Bottling Co.*, 450 F.3d at 486-88 (collecting cases and analyzing the issue).

complainant's burden of proof from three different options: a liberal "to any degree" standard, an intermediate "substantial factor" standard, and a stringent "but-for" or "determinative factor" standard. *See Allison v. Hous. Auth. of Seattle*, 118 Wn.2d 79, 85-95, 821 P.2d 34 (1991); *Wilmot*, 118 Wn.2d at 69-73. The Court selected the "substantial or important factor" as the appropriate burden of proof for statutory discrimination cases. *Allison*, 118 Wn.2d at 85-95; *Wilmot*, 118 Wn.2d at 71-73.

Unfair labor practice complaints filed under RCW 41.56.140 are statutory discrimination cases, and *Wilmot* and *Allison* govern the burden of proof for such complaints. *City of Federal Way*, 93 Wn. App. at 512-13. Consequently, a complainant seeking to use the subordinate bias theory of liability must show that the subordinate's animus was a substantial factor in the decision resulting in the unfair labor practice. This recognizes that subordinate bias liability cases are, essentially, cases with multiple causes: the subordinate's animus and the decision maker's ultimate decision. The *Allison* Court noted that the substantial factor test is the appropriate burden of proof where multiple actors might have caused the complainant's injury. 118 Wn.2d at 93-94 (quoting Robert Belton, *Causation in Employment Discrimination Law*, 34 WAYNE L. REV. 1235, 1248 (1988)).

The Commission's order merely required that an agent with animus "influence[]" an adverse employment decision. AR at 1396. This standard appears equivalent to the rejected "to any degree" standard because an agent with animus could influence the ultimate decision by having a trivial, but not remotely important, effect on the decision maker's choice. The standard adopted by the Commission is thus incompatible with the burden of proof assigned to

complainants seeking to prove a statutory discrimination case under Washington law. *See Allison*, 118 Wn.2d at 94.

Further, the Commission appears to have compounded its initial, burden-lowering error by requiring the employer to show that "the decision was made completely free from the recommendation of the subordinates who displayed union animus" to escape liability. AR at 1396. This is contrary to the "substantial motivating factor" test and reverses the burden of proof. Under Washington law, the complainant always bears the burden of proving causation in any tort-like action. *Baldwin*, 112 Wn.2d at 135. This remains true in statutory discrimination cases, which are, at root, intentional tort claims. *Baldwin*, 112 Wn.2d at 133-36; *Shrager*, 913 F.2d at 405. To place the burden of proving a lack of animus on the employer eliminates the complainant's burden of proving causation in contravention of the *Wilmot* framework. 118 Wn.2d at 68 (citing *Baldwin*, 112 Wn.2d at 134).

However, we find the Commission's error harmless. Under the APA judicial relief is appropriate only if the "person seeking relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). Based on the examiner's finding of fact 27, which it adopted, the Commission stated:

> the record clearly demonstrates that Cook relied upon the tainted recommendation of Sutter when making his decision. Although Cook testified that he considered selecting Davis over Martin, Schoene testified that Cook stated he simply counted the votes of the members of the interview panel to make his final decision. The Examiner found Schoene's testimony credible.

AR at 1397. The use of "relied" in this finding means that the Commission found that Cook depended on Sutter's recommendation to make his selection. BLACK'S LAW DICTIONARY 1404 (9th ed. 2009) ("Reliance" means "[d]ependence or trust by a person, esp. when combined with

an action based on that dependence or trust. — rely, vb."). This is essentially a finding of but-for causation and necessarily satisfies the lesser burden of proving that Sutter's recommendation was a substantial factor in Cook's decision to select Davis. *See Wilmot*, 118 Wn.2d at 71-73 (showing needed to prove impermissible motive was a substantial factor is a lesser showing than the one needed to prove it was a but-for cause of an adverse employment action). The City suffered no prejudice from the error, and we affirm.[6]

C.      Notice

The City next argues that this case differs from *Staub* because Cook had no notice of Sutter's anti-union animus and therefore had no reason to perform an independent investigation. The City also claims the Commission should not have found liability unless Cook knew, or should have known, of Sutter's animus based on Washington precedent. We disagree, because notice to the decision maker was not a prerequisite to the holding in *Staub*, and, even if it were, under both the case law and the record before us, the City had knowledge of the subordinate's animus.

First, the City contends that the decision maker in *Staub* had notice of the discriminatory intent of the supervisors recommending the employee's termination. The City misreads *Staub*.

---

[6] Amicus curiae quote language from the examiner's opinion stating that the evidence "did not tip the scales" toward a finding that Cook's decision was based on union animus. Br. of Amicus Curiae Wash. State Ass'n of Mun. Attorneys at 8. Other language in the examiner's opinion states that Cook's decision was "not substantially base[d] . . . on union animus." AR at 1228. Amicus curiae and the City rely on this type of language to suggest Sutter's tainted recommendation was not a substantial factor in Cook's decision. But both of these passages, read in light of the examiner's full decision, mean that Cook's decision was not based substantially on *his own* union animus. The examiner found that Cook "relied [o]n" Sutter's recommendation, which was tainted by union animus, in reaching his decision. AR at 1233. The Commission adopted this finding. As discussed below, substantial evidence supports this finding as meaning that Sutter's recommendation was a substantial factor in Cook's decision.

21

No notice to the decision maker of any subordinate animus before the decision to terminate the employee appears in the Supreme Court's recitation of the facts of *Staub*. *See* 131 S. Ct. at 1189. Nor do any of the other subordinate bias liability cases make the decision maker's awareness of the supervisor's bias determinative of liability. *See, e.g., Shager*, 913 F.2d 399-400. We consider the role of the decision maker only to see if he or she acted as a supervening cause of the adverse action. If he or she makes an independent choice to take the adverse action substantially free of the subordinate's animus, this supersedes the subordinate's tainted act as the cause of the adverse employment action, and the employer is not liable for the supervisor's animus. *Staub*, 131 S. Ct. at 1193. Notice to the decision maker is irrelevant to this inquiry.

More importantly, the City's argument invites an abuse which *Staub* warned against. If an employer may avoid liability by insulating a decision maker from notice, "then the employer will be effectively shielded from [liability for] discriminatory acts" done by its agents. *Staub*, 131 S. Ct. at 1193. RCW 41.56.140(1) reflects the legislature's intent to hold employers accountable for unfair labor practices. The argument offered by the City allows public employers to sidestep the public policy against discrimination for union activity by simply creating some kind of notice "firewall" between a decision maker and others in the employer entity. We decline to encourage the erection of this sort of firewall by conditioning subordinate bias liability on notice to the decision maker. *See Staub*, 131 S. Ct. at 1193.

Turning next to whether the City had such notice, Sutter acted within the authority delegated to him by the City. The City empowered him to supervise and make recommendations about the assignments of its other employees. Where the subordinate with animus acts within his or her delegated powers over other employees, we charge the employer principal with

22

constructive knowledge of the wrongful conduct to provide an incentive to prevent it. *See Shrager*, 913 F.2d at 405.

In addition, the facts of this case suggest Cook had notice of concerns about anti-union animus affecting his decision. Schoene noted that numerous people asked him, even before the interviews, why the City bothered giving Martin an interview because he would not be selected to the unit. Sutter alerted Cook to Schoene's concerns. When Schoene talked to him about the selection process, Cook immediately, and without prompting, declared that Martin's union activities had no effect on the decision. Cook's statement shows his alertness to possible anti-union animus in the decision making process. Thus, the City cannot avoid liability by claiming that Cook, its decision maker, lacked notice of this animus.

D.    Termination Versus the Denial of a Benefit

Finally, the City contends that *Staub* is inapplicable because the City denied Martin a benefit rather than terminating him. We disagree, because adverse employment actions are not confined to terminations, but also include loss of an ascertainable benefit.

The City failed to assign error to finding of fact 6, making it a verity on appeal. The finding states that the motorcycle unit assignment, although not accompanied by a "pay premium," did carry certain benefits. AR at 1230. These include, among others, serving as a positive factor in promotional decisions, desirable shifts, and providing the possibility of overtime. The City may not argue that Martin suffered no harm because of the denial of the transfer. He lost the benefits the transfer would have given him.

RCW 41.56.140 embodies a legislative choice to protect workers from "retaliatory action" for "exercis[ing] their rights to engage in protected collective bargaining activity." *City*

23

*of Federal Way*, 93 Wn. App. at 513. Retaliatory action encompasses the infliction of injury more subtle than termination. *See, e.g., Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 851, 861-63, 991 P.2d 1182 (2000) (applying the *Wilmot* framework to analyze claims asserting the worker received less desirable work shifts in retaliation for asserting statutory rights). The Commission's application of *Wilmot* recognizes this, requiring the complainant to show that the employer deprived the employee of "some ascertainable right, benefit, or status." *See, e.g., Wash. Fed'n of State Emps. v. Univ. of Wash.*, No. 23649-U-10-6033, 2013 WL 1796444, at *2-6 (Wash. Pub. Emp't Relations Comm'n, Apr. 23, 2013) (finding an adverse employment decision based on a discipline letter, which could lead to consequences other than termination).

Because the legislature has charged the Commission with "administering [the] special field of law" of unfair labor practices, and has "endowed [it] with quasi-judicial functions," it has substantial expertise in the area, and we give substantial deference to its determination that unfair practices include adverse events other than termination. *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 391, 687 P.2d 195 (1984); *see City of Vancouver*, 107 Wn. App. at 703. Martin's loss of the benefits conferred by selection to the motorcycle unit was punishment for union activities, just as any termination would have been. We see no reason to disagree with the Commission's conclusion to this effect.

### III. THE COMMISSION DID NOT ENGAGE IN RULE MAKING WITH ITS ORDER

The City next contends that the Commission's decision creates a new rule by subjecting supervisors in their individual capacity, rather than the employer itself, to liability for an unfair labor practice. Because the Commission's order did not hold Cook personally liable, it did not constitute rule making.

24

No. 43641-8-II

The APA sets out certain requirements for rule making. *See* RCW 34.05.310-.395. An agency's failure to comply with these procedures in enacting a rule requires invalidation of the rule. *Failor's Pharm. v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 497, 886 P.2d 147 (1994); RCW 34.05.570(2)(c). But, as the Supreme Court has noted, "it is axiomatic that '[f]or rule making procedures to apply, an agency action or inaction must fall into the APA definition of a rule.'" *Budget Rent-a-Car Corp. v. Dep't of Licensing*, 144 Wn.2d 889, 895, 31 P.3d 1174 (2001) (quoting *Failor's Pharm.*, 125 Wn.2d at 493).

The APA defines both rules, the products of agency rule making, and orders, the products of adjudicatory proceedings. A rule is

> any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession, or (e) which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale.

RCW 34.05.010(16). An order, on the other hand, is "a written statement of particular applicability that finally determines the legal rights, duties, privileges, immunities, or other legal interests of a specific person or persons." RCW 34.05.010(11)(a).

At oral argument the City conceded that, absent the imposition of individual liability on Cook, the Commission did not circumvent the rule making requirements of the APA. Wash. Court of Appeals, *City of Vancouver v. State of Wash. Pub. Emp't Relations Comm'n*, No. 43641-8, oral argument (Dec. 6, 2013), at 4 min., 5 sec. (on file with court). Under the APA definitions immediately above, the City's concession is well offered. As discussed above, we do

25

not believe that the Commission's order subjects Cook to individual liability or creates a rule doing so. Instead, the Commission's order is an exercise of the Commission's quasi-judicial power focusing on the Guild's proof of a causal link between Sutter's animus and the denial of the motorcycle position to Martin.

## IV. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FINDINGS

Finally, the City also assigns error to three findings made by the examiner and adopted by the Commission, claiming that they lack evidentiary support. We disagree.

A.  Finding of Fact 22 Is Supported by Substantial Evidence As Is Necessary to Affirm the Commission's Order

The City first assigns error to finding of fact 22, which reads,

[t]he employer asserted that it did not select Martin for the motors officer position because of the amount of leave time he used. The inclusion of union leave in consideration, as well as the fact that the panel's unanimous choice used more leave than any candidate, lend[s] itself to a conclusion that the employer's stated reason was pretextual.

AR at 1232.

The City argues that the examiner erred in finding that the selection panel considered Martin's union leave. It contends that uncontroverted testimony from Sutter and Cook demonstrates that Martin's union leave was not considered.

Initially, we note that the City, although generally assigning error to finding of fact 22, does not argue that the examiner erred by finding that the selection of Neill, despite his use of more leave than Martin, led to a conclusion the leave issue was pretextual. This portion of the finding is therefore a verity on appeal. Although we find that a portion of finding of fact 22 is not supported by substantial evidence, as discussed below, we sustain the finding of pretext on the unchallenged portion, which is a verity on appeal.

26

We also note that the examiner found Sutter lacked credibility. The examiner's written opinion determined that "Sutter's memory and account of events are unreliable and contradictory to the testimony of other witnesses." AR at 1226. We defer to this credibility determination.

Nonetheless, we hold that substantial evidence does not support the challenged portion of finding of fact 22. The only evidence that indicates the panel considered the Guild leave was its inclusion into exhibit 27. No evidence from Foster or Schoene stated that they considered the "other" leave column, and Sutter explicitly denied doing so. While we must discount Sutter's statement somewhat given the examiner's finding that he lacked credibility, Cook was adamant that Martin's Guild leave was not factored into consideration. Given the absence of anyone stating they considered Guild leave, the fact that it was included in the interview packet does not rise to the level of substantial evidence.

B.    Substantial Evidence Supports Finding of Fact 24

The City next argues that the evidence does not support finding of fact 24, which provides:

> Sutter asserted that his only concern with selecting Martin to the motors position was his leave use. However, Sutter testified that he wanted someone for the position who shared the Chief's "vision." Sutter's statement suggests that by looking for someone who shared the Chief's vision, he wanted someone who did not make statements or engage in activities in opposition to the Chief, as Martin did in his capacity as union president.

AR at 1232-33.

The City argues that Sutter's comment was an "isolated statement" that cannot give rise to an inference that his recommendation of Davis was pretextual. Br. of Appellant at 43. Specifically, the City contends that Sutter did not direct his statement about supporting the police

chief's vision at Martin and that the comment therefore cannot provide evidence of anti-union animus.

We have, on at least two occasions, held that an offhand comment not directed at the complainant does not suffice to show an employer took discriminatory action. *Scrivener v. Clark Coll.*, 176 Wn. App. 405, 414-16, 309 P.3d 613 (2013), *review granted*, 316 P.3d 495 (2014); *Kirby v. City of Tacoma*, 124 Wn. App. 454, 467 n.10, 98 P.3d 827 (2004). However, the City's argument cannot survive a review of the record. The comment at issue came in the context of Schoene's summary of why Martin's skills made him the most qualified for a position in the unit. While Sutter did not utter Martin's name when stating that the best fit for the unit would be someone supportive of the police chief's vision, the other panel members viewed the statement as a specific reference to Martin. Schoene immediately answered that he understood that Martin had difficulties with upper management, but, at his level in the department, Martin had always seemed supportive of the chief's vision. Sutter did not reply that Schoene misunderstood him, indicating that Schoene correctly understood the comment targeted at Martin. In context, this was not an offhand comment.

The City also argues that the examiner disregarded Sutter's explanation of his comment on cross-examination, which was that he meant that Martin's absences would undercut the presence in the community the police chief envisioned for the unit. The examiner can refuse to credit testimony, and we will not upset these determinations. *Thomas*, 176 Wn. App. at 813. As discussed above, the examiner found Sutter lacked credibility, so the examiner could refuse to consider Sutter's explanation as truthful. Further, Sutter did not offer this explanation to correct Schoene at the time, offering it only at trial, which allowed the examiner to conclude the

28

explanation was pretextual and unworthy of credence. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir. 1996) (the fact finder may determine an explanation is pretextual when offered only at trial despite earlier opportunities to do so).

The record contains evidence of the numerous ways Martin, as Guild president, used the CBA to block Cook's realization of his vision for the department. One of Martin's invocations of the CBA to impede Cook's reforms to the department occurred contemporaneously with the panel's interviews. *See Wilmot*, 118 Wn.2d at 69 (temporal proximity between event and alleged retaliatory action important in establishing pretext). Given these activities, their timing, and Sutter's awareness of them, substantial evidence supported the examiner's finding that Sutter's statement betrayed his animus towards Martin for Martin's protected activities and that his concerns about Martin's leave use were pretextual.

## C. Substantial Evidence Supports Finding of Fact 27

Finally, the City assigns error to finding of fact 27, which reads, "Although Cook's decision not to select Martin was not substantially based on union animus, he relied in making that decision on a tainted recommendation from Sutter." AR at 1233.

The City, although assigning error to this finding, makes no argument as to why the finding is erroneous. We decline to "consider assignments of error unsupported by argument or authority." *Nelson v. Dep't of Labor & Indus.*, 175 Wn. App. 718, 728, 308 P.3d 686 (2013). Even if we were to reach the merits of the City's argument, substantial supporting evidence exists in the record. Schoene testified about his meeting with Cook and stated that Cook had described how he made the decision by simply counting votes. Cook himself acknowledged the

No. 43641-8-II

meeting and stated that he discussed his decision making process with Schoene while they talked. We affirm the finding.

## V. ATTORNEY FEES

The City and the Guild both request attorney fees. Both make this request in the final sentence of their conclusion sections. Neither the City nor the Guild provides argument or citation to authority showing their entitlement to attorney fees. Because they fail to comply with the requirements of RAP 18.1, we reject their "bald request[s] for attorney fees on appeal." *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998).

## CONCLUSION

Although we find the Commission applied an erroneous burden of proof, we find the error harmless and affirm its decision that the City committed an unfair labor practice by denying Martin the position in the motorcycle unit. We affirm the Commission's order requiring the City to remedy its unfair labor practices by offering Martin a position in that unit as well as taking other measures.

BJORGEN, J.

We concur:

JOHANSON, A.C.J.

MAXA, J.

30