# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KITSAP COUNTY JUVENILE DETENTION OFFICERS' GUILD,<br><br>Respondents,<br><br>v.<br><br>KITSAP COUNTY,<br><br>Appellant. | No. 48723-3-II<br><br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — Kitsap County appeals the superior court's reversal of the Public Employment Relations Commission's (PERC) decision that concluded Kitsap County did not commit an unfair labor practice against the Kitsap County Juvenile Detention Officers' Guild (Guild). We conclude that PERC did not err by concluding that Kitsap County did not commit an unfair labor practice, and that it correctly applied its procedural requirements. We reverse the superior court, and affirm PERC.

## FACTS

In July 2012, PERC certified the Guild as the representative of the County's Juvenile and Family Court Services Department's juvenile detention officers and food service staff. The bargaining unit had two employers. The Kitsap County Superior Court (superior court) was the employer for nonwage matters, and the Kitsap County Board of County Commissioners (County) was the employer for wage-related matters.[1]

---

[1] *See* Former RCW 41.56.030(12), (13); LAWS OF 2011, 1st Sp. S. Ch. 21, § 11.

Fernando Conill, the County's Labor Relations Manager and chief negotiator, represented the County on wage-related matters. Michael Merringer, Juvenile Court Director of Services, and Bill Truemper, Juvenile Detention Division manager, represented the superior court on nonwage-related matters. Christopher Casillas, the Guild's attorney and chief negotiator, Pepe Pedesclaux, the Guild's President, and Jack Kissler, the Guild's Vice-President, represented the Guild.

On September 11, the parties met for the first time to negotiate a new collective bargaining agreement (CBA). The County made a number of wage-related proposals, which included eliminating contractual overtime. The Guild strongly objected to the proposal and the parties discussed the issue. The Guild also proposed a number of ground rules, but the parties could not agree on them because the County needed to discuss the proposed rules with individuals not present at the table. The parties continued to have bargaining sessions approximately once or twice a month.

On September 25, during another bargaining session, the County proposed essentially the same grievance procedure that had existed since 1994. It proposed a bifurcated procedure where nonwage-related grievances went to Step 2 where a superior court judge would render a binding decision.

On October 9, both parties presented their complete opening proposals. Regarding the grievance procedure, the Guild proposed that at Step 2, a neutral arbitrator would hear the grievances and the arbitrator's decision would be "final and binding." Administrative Record (AR) at 154. The Guild's primary concern with the existing procedure involved the fact that the employer, a superior court judge, would make the decision instead of an independent body. The Guild also had concerns with the meaning of "binding" in the context of the superior court

grievance process. AR at 253. The County did not change its position on this issue. It also maintained its position on eliminating overtime pay.

The parties also discussed including a nondiscrimination provision. The County did not express any concern or opposition and seemed to agree on having such a provision. The parties, however, were unable to enter into a tentative agreement on that provision. According to Kissler, the County needed to confer with someone not at the table regarding the language of the provision, and the County would get back to the Guild with a response. Kissler assumed the County needed to confer with its legal team. Merringer later explained that the County was drafting either a new definition or a new section of its nondiscrimination policy, and Conill wanted to review it before agreeing to the provision. The Guild did not object.

On December 4, the Guild presented the County with a recently passed resolution from the County that amended the personnel manual for non-represented employees. The resolution maintained contractual overtime pay. When the Guild asked the County to explain and clarify why its proposal was contrary to the County resolution, the County stated it did not know about the resolution. The County told the Guild that it would look into the matter and respond later. Several sessions later, the County modified its proposal to reflect the County's position in the resolution.

The Guild continually expressed concerns about the County's proposed grievance procedure. The County indicated that it understood the Guild's concerns, but it needed to take the Guild's proposal to the superior court judges and address the issue at an upcoming meeting. The Guild seemed amendable to this response and the parties moved on to other topics.

On January 25, 2013, the parties again discussed the grievance procedure. Both parties maintained their respective positions. The Guild expressed its concerns with the definition of

"binding" and inquired if that would preclude the Guild from filing a lawsuit. AR at 368. The County asked Casillas to write out his questions so it could discuss them with its attorney.

On February 7, in between bargaining sessions, Casillas e-mailed Conill and Merringer and pointed out that there was a strong tradition in labor relations to resolve CBA disputes through binding arbitration by a neutral party. Casillas asked whether the County's proposed grievance procedure "would constitute a waiver of its bargaining rights to . . . file a lawsuit against the County and Superior Court for an alleged violation of the terms" of the CBA. AR at 590. He further stated that it was "incumbent upon the County" to explain its rationale for having such a grievance procedure. AR at 590.

Because Merringer perceived the Guild's inquiries to be legal questions, he responded and attached the County's attorney's response. This correspondence, like the subsequent ones, took place via e-mail. The attorney cited the statute stating that CBAs did not require arbitration procedures, but could provide for one. The attorney concluded that absent an agreement for arbitration, the superior courts had original jurisdiction in all cases, including disputes from CBAs.

The Guild felt the response left its questions unanswered. It wanted clarification on the word "binding" and wanted the County's rationale for its position. Casillas responded to Merringer, "[T]o the extent the County's bargaining team has to rely on the opinion of individuals who are not present at the table to explain its proposals, the Guild does not view such an approach as consistent with the good faith bargaining obligation." AR at 595.

On February 14, Merringer responded to Casillas, stating that he believed the County's attorney answered the Guild's questions. He also said that neither he nor Conill could answer legal questions or provide legal opinions or advice. He added that the people at the bargaining table could and did explain their positions.

4

Casillas responded and reasserted his positions that the County's attorney did not answer his questions and that he did not request a legal opinion. He wanted an explanation for the County's position and the intent behind its proposal so that the Guild could understand it and make a counter proposal.

Merringer replied that he looked forward to continuing the discussion at their next scheduled meeting. Merringer later admitted that the County did "[n]ot specifically" respond to the Guild's questions about waiver and the County's rationale for its grievance procedure proposal. AR at 395. However, he did not view the question as asking for an explanation of the County's rationale.

On February 26, the parties' held another meeting scheduled for three hours. Because of the frustrations from the e-mails, tension existed at the beginning of the session. The parties had a number of agenda items, including the grievance procedure.

After discussing the grievance procedure for approximately one hour, the County explained its interpretation of the word "binding." Merringer also explained that he met with the superior court judges and had a response for the Guild. He listed six reasons to support the County's rationale from a document he prepared from his meeting.

When asked why the judges did not want to use arbitration, Merringer explained that the judges believed that the existing grievance procedure, which utilized the courts, was more transparent. It occurred in a public forum with formal rules of evidence and discovery. He further explained that, according to the County's attorney, the proposed grievance procedure did not constitute a waiver of future litigation. Other reasons for wanting to maintain the existing procedure included the judges' belief that the legal process effectively obtained fair results,

arbitrators did not have to follow legal precedent, and courts had limited review of arbitrator decisions.

When Casillas asked for the County's rationale again, Merringer gave the same answer. The Guild became frustrated and felt that the County was unprepared or unwilling to engage in the bargaining process. When Casillas asked why binding arbitration was not preferable, Merringer stated that he answered the question. He then restated his explanation. This exchange occurred at least three times. Merringer, also frustrated, asked Conill for a break because they were not "making any headway on the issue." AR at 375.

During the break, Merringer contacted the County's attorney who advised him to offer to move onto other agenda items. If the Guild refused to move onto other agenda items, Merringer should terminate the session. Merringer returned from the break and informed the parties that he believed he answered the Guild's questions to the fullest and wanted to move on to another item. He stated that they "would beat the grievance process to death" and "were not going to make any headway." AR at 376. He was willing to move on to another topic on the agenda, and if the Guild refused, he "was done for the day." AR at 376. When Casillas responded that the Guild still had more questions about the grievance procedure, Merringer stated, "[O]kay, I'm done" and walked out of the bargaining session. AR at 376. He asked Conill to schedule another meeting.

On March 11, 2013 the Guild filed an unfair labor practice complaint against the County. It alleged that the County interfered with employee rights, and refused to bargain in good faith. The County denied the allegations.

I.      HEARING EXAMINER'S DECISION

On October 6, 2014, after a formal hearing before a PERC hearing examiner, the examiner issued a decision ruling in favor of the Guild. Both parties filed post-hearing briefs.

The decision included 26 findings of fact. The hearing examiner concluded that the County breached its good faith bargaining obligation by not sending bargaining representatives to the table with sufficient authority to engage in meaningful bargaining, thereby committing an unfair labor practice.

II.     PERC'S DECISION

Shortly thereafter, the County filed an appeal with PERC. In its notice of appeal, the County stated its grounds for appeal and assigned error to 17 findings of fact because they did not completely describe the totality of circumstances, and they were irrelevant to whether the County's representative had sufficient authority to engage in meaningful bargaining.

The County also assigned error to the examiner's conclusion of law that the County breached its good faith bargaining obligations by not sending representatives to the table with sufficient authority to engage in meaningful bargaining and, therefore, committed an unfair labor practice. Because the County did not timely file its appeal brief, PERC did not consider it. PERC did consider the pleadings, the evidence presented at the hearing, the briefing before the hearing examiner, and the Guild's appeal brief.

PERC issued its decision and vacated the hearing examiner's order. It concluded that, based on the totality of the circumstances, the County did not breach its good faith bargaining obligation or send negotiators to the table with insufficient authority to bargain. It stated:

> The evidence in this case persuades us that the [County] was taking back information to be able to develop new proposals, gather information, and look at internal consistency, not that the [County] was consulting with individuals . . . not present for bargaining. . . . [E]fforts to gather information were made in good faith.

. . . .

> [Its] negotiators had authority to enter tentative agreements and did so; listened and engaged in meaningful discussion; and, when necessary, consulted with individuals not at the table to further develop proposals.

AR at 18. PERC also found Merringer's testimony to be more credible than Kissler's on the discussion of the nondiscrimination provision. It noted that the hearing examiner made no credibility determinations.

PERC affirmed some of the challenged findings of fact and adopted them as its own. It also vacated and substituted its own findings of fact for some of the other challenged findings. PERC's decision did not state that substantial evidence did not support the examiner's findings of fact.

III.     SUPERIOR COURT'S DECISION

On July 2, 2015, the Guild filed a petition for review in superior court. It sought to reinstate the hearing examiner's findings and conclusions. The court ruled in favor of the Guild and entered an order reversing PERC's decision.

The County appeals the superior court order.

ANALYSIS

I.     STANDARD OF REVIEW

We review a PERC decision concerning an unfair labor practice case under the Administrative Procedures Act (APA), chapter 34.05 RCW. *Yakima County v. Yakima County Law Enf't Officers' Guild*, 174 Wn. App. 171, 180, 297 P.3d 745 (2013)). In reviewing a PERC decision, we sit in the same position as the superior court. RCW 34.05.570; *DeLacey v. Clover Park Sch. Dist.*, 117 Wn. App. 291, 295, 69 P.3d 877 (2003)). We review PERC's decision, not that of the hearing examiner or the superior court. *Yakima County*, 174 Wn. App. at 180.

8

We review an agency's conclusions of law de novo and, in doing so, may substitute our interpretation of the law for that of PERC. *Yakima County*, 174 Wn. App. at 180. However, we give PERC's interpretation of the public employees' collective bargaining statutes, chapter 41.56 RCW, great weight and substantial deference. *City of Vancouver v. Pub. Emp't Relations Comm'n*, 180 Wn. App. 333, 347, 325 P.3d 213 (2014).

We review challenges to an agency's findings of fact for "'substantial evidence in light of the whole record, i.e., evidence sufficient to persuade a fair-minded person of their truth.'" *Yakima Police Patrolmen's Ass'n v. City of Yakima*, 153 Wn. App. 541, 553, 222 P.3d 1217 (2009) (quoting *City of Federal Way v. Pub. Emp't Relations Comm'n*, 93 Wn. App. 509, 512, 970 P.2d 752 (1998)). Unchallenged factual findings are verities on appeal. *City of Vancouver*, 180 Wn. App. at 347. The substantial evidence standard is deferential; we do not substitute our view of the facts for that of the agency if substantial evidence is found. *Yakima Police Ass'n*, 153 Wn. App. at 553. Because PERC is entitled to substitute its findings for those of the hearing examiner, it is the PERC's findings that are relevant on appeal.[2] *Yakima Police Ass'n*, 153 Wn. App. at 552; *see* RCW 34.05.464(4).

We may grant relief from an agency order if, among other reasons, the agency (1) engaged in unlawful procedure, decision-making process, or failed to follow a prescribed procedure; (2) erroneously interpreted or applied the law; (3) the agency order is not supported by evidence that is substantial when viewed in light of the entire record; (4) the order is inconsistent with an agency

---

[2] "While the APA provides that the reviewing agency [PERC] can substitute its own findings of fact for that of the hearing examiner's where they are supported by substantial evidence, 'such substitutions cannot be arbitrary and capricious:; An action is arbitrary or capricious when the governmental body reaches its decision willfully and unreasonably, without consideration and in disregard of facts or circumstances.'" *City of Vancouver v. Pub. Emps. Relations Comm'n*, 107 Wn. App. 694, 704, 33 P.3d 74 (2001) (quoting *Towle v. Dep't of Fish & Wildlife*, 94 Wn. App. 196, 209, 971 P.2d 591 (1999)).

rule; or (4) the order is arbitrary or capricious. RCW 34.05.570(3)(c), (d), (e), (h), (i). The party asserting the invalidity of an agency action has the burden of demonstrating it. RCW 34.05.570(1)(a); *DeLacey*, 117 Wn. App. at 295.

## II. UNFAIR LABOR PRACTICE

The Guild argues that PERC erred when it concluded that the County did not commit an unfair labor practice and that PERC did not apply the "totality of the circumstances" standard. Resp't's Br. at 18. The Guild argues that, under this standard, the County committed an unfair labor practice by refusing to send representatives to the table with sufficient authority to engage in meaningful bargaining. We conclude that PERC properly determined that the County did not commit an unfair labor practice.

### A. LEGAL PRINCIPLES

A public employer has a duty to bargain with the exclusive bargaining representative of its employees. RCW 41.56.030(4). It is an unfair labor practice for a public employer to "interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed by this chapter," or "refuse to engage in collective bargaining with the certified exclusive bargaining representative." RCW 41.56.140(1), (4). "Collective bargaining" means:

> the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer, except that by such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter.

RCW 41.56.030(4).

In determining whether a party violated its duty to bargain in good faith, PERC analyzes the party's conduct during negotiations and examines the totality of the circumstances. *Kitsap*

*County 911 Emps. Guild v. Kitsap County*, No. 24240-U-11-6210, at 6 (Wash. Pub. Emp't Relations Comm'n Aug. 14, 2013). A party violates its duty to bargain in good faith by one per se violation, such as a refusal to meet at reasonable times and places or a refusal to make counterproposals, or through a series of questionable acts which, when examined as a whole, show a lack of good faith bargaining, but standing alone are not a per se violation. *Kitsap County 911 Emps. Guild*, No. 24240-U-11-6210, at 6.

Both parties are required to vest their representatives with sufficient authority to engage in meaningful negotiations and to enter into tentative agreements. *Pub. Sch. Emps. of Wash. v. W. Wash. Univ.*, No. 18898-U-04-4804, at 3 (Wash. Pub Emp't Relations Comm'n Jan. 3, 2008). But it is not a breach of the duty to bargain in good faith if parties at the bargaining table need to consult with those not physically present during negotiations. *Pub. Sch. Emps. of Wash. v. Wash. State Univ.*, No. 24321-U-11-6232, at 10 (Wash. Pub. Emp't Relations Comm'n May 10, 2013), *aff'd*, No. 24576-U-12-6289.

The duty to bargain includes the duty to provide relevant information requested by the opposite party for the proper performance of its duties in the bargaining process. *City of Bellevue v. Int'l Ass'n of Fire Fighters, Local 1604*, 119 Wn.2d 373, 383, 831 P.2d 738 (1992). With or without an information request, good faith bargaining always requires the parties to fully explain and provide reasons and rationale for a proposal, as well as for the rejection of a proposal made by the other party. *Redmond Police Ass'n v. City of Redmond*, No. 16910-U-02-4403, at 6 (Wash. Pub. Emp't Relations Comm'n Mar. 21, 2005).

The duty also means the parties must engage in full and frank discussions on disputed issues, and explore possible alternatives that satisfactorily accommodate the interests of both parties. *Snohomish County Clerk's Ass'n v. Snohomish County*, No. 20074-U-06-5105, at 2

(Wash. Pub. Emp't Relations Comm'n Mar. 26, 2008). While the parties' obligations do not compel them to agree to proposals or make concessions, "a party is not entitled to reduce collective bargaining to an exercise in futility." *Snohomish County Clerk's Ass'n*, No. 20074-U-06-5105, at 2. "The duty to bargain does not require parties to engage in fruitless give and take marathon discussions*." Int'l Org. of Masters, Mates & Pilots v. Dep't. of Transp., Ferries Div.*, No. 588-MEC, at 2 (Wash. Pub. Emp't Relations Comm'n Aug. 31, 2010).

The duty to bargain also requires parties to meet at reasonable times. *Mountlake Terrace Police Guild v. City of Mountlake Terrace*, No. 24665-U-12-6303, at 6 (Wash. Pub. Emp't Relations Comm'n Mar. 12, 2014). To prove a failure to meet, the complainant must show that it requested negotiations over a mandatory subject of bargaining and the other party failed or refused to meet, or imposed unreasonable conditions or limitations that frustrated the collective bargaining process. *Mountlake Terrace Police Guild*, No. 24665-U-12-6303, at 6. Unilateral cancellation of bargaining sessions is an example of bad faith bargaining. *Snohomish County Clerk's Ass'n*, No. 20074-U-06-5105, at 7.

Conduct indicative of bad faith bargaining includes engaging in tactics that frustrate or stall agreement; setting forth proposals that are predictably unpalatable to the other party knowing that an agreement is impossible; not explaining or providing untenable explanations of a position; or entering sessions with a take-it-or-leave-it attitude. *Mansfield Sch. Dist. v. Mansfield Educ. Ass'n*, No. 10762-U-93-2499, at 3-5 (Wash. Pub. Emp't Relations Comm'n Mar. 1995). A party cannot have a predetermined resolve not to budge from an initial position; however, a party may stand firm on a position. *Mansfield Sch. Dist.*, No. 10762-U-93-2499, at 3. An adamant insistence on a bargaining issue is not, by itself, a refusal to bargain. *Mansfield Sch. Dist.*, No. 10762-U-93-2499, at 3.

B.     FAILURE TO BARGAIN IN GOOD FAITH

The Guild argues that the failure to bargain in good faith occurred regarding the County's positions or actions on overtime rules, the nondiscrimination provision, and the grievance procedure.  It also argues that the County refused to meet at reasonable times.

1.     OVERTIME

The Guild first argues that because the County representatives did not know that their proposal to eliminate overtime pay was in direct opposition to the County resolution, and because it took several bargaining sessions to confer with someone with authority and change its proposal, the County's representatives at the table did not have actual authority to bargain.  We disagree with the Guild.

While the lack of knowledge about an action taken by the governing body may be of concern, there is insufficient evidence that the County's bargaining team lacked authority to bargain.  Further, the evidence shows that the County listened to the Guild's concerns and made a good faith effort to look into the County resolution.  The County subsequently changed its proposal to mirror the resolution and to reinstate overtime pay.  That the County initially did not have knowledge of the resolution and required several sessions to research the issue does not constitute evidence that the representatives lacked authority.

At times, parties will require discussions with constituents not present during bargaining. In this case, the County disclosed its unawareness of the resolution and its need to make an inquiry before it could provide a response.  It engaged in a full and frank discussion on the disputed issue, and ultimately came out with a proposal that accommodated the interests of both parties. Therefore, the County did not fail to bargain in good faith regarding this area of discussion.

### 2. NONDISCRIMINATION

The Guild next argues that by not entering into a tentative agreement regarding the nondiscrimination provision, a provision which both parties seemed to agree, this demonstrated that the County's bargaining team lacked authority to agree to anything and consequently hamstrung the Guild. We disagree.

The evidence shows that the County explained to the Guild why it needed to review the provision before incorporating it into the CBA. The evidence also shows that the Guild did not object. It is not uncommon for a party to need to review a proposal with constituents not at the table before reaching a tentative agreement. Here, Conill's conduct did not intend to frustrate or stall the parties from coming to a tentative agreement. He agreed that the CBA should have a nondiscrimination provision, but he also knew that the County was in the process of redrafting its nondiscrimination policy. Therefore, Conill did not act unreasonably by not immediately agreeing to the provision, and the County did not fail to bargain in good faith regarding this subject.

### 3. GRIEVANCE PROCEDURE

The Guild next argues that the County failed to explain its proposal regarding the grievance procedure and did not provide a rationale so that it could counter-propose language that might be accepted by the County. We disagree with the Guild.

The evidence shows that Merringer proactively provided the information that Casillas requested. Because Merringer believed that the questions asked at the January 25 session were legal in nature, he immediately consulted the County's attorney and responded to Casillas. In addition, Merringer communicated with the judges who provided six reasons why they wanted to preserve the existing grievance procedure. Merringer provided the County's rationale for its proposal to the Guild.

Further, the evidence does not show that the County attempted to frustrate the bargaining process. While the County remained firm in its position, this fact does not demonstrate that it had a predetermined resolve not to budge from that position. An adamant insistence on a bargaining position is not, by itself, a refusal to bargain. The County proposed maintaining a grievance procedure that had been in effect since 1994. It did not intend to present an unpalatable proposal knowing an agreement was impossible. The evidence shows that the County was firm in its position and explained its rationale. It did not bargain in bad faith on this issue.

4. MEETING AT REASONABLE TIMES

Lastly, the Guild argues that Merringer "unilaterally" ended the parties' final bargaining session by issuing an ultimatum that "hamstrung" the Guild. Resp't's Br. at 29. We disagree with the Guild. .

Casillas knew that both he and Merringer were frustrated, and that they firmly believed in their parties' respective proposals on the grievance procedure. When Merringer realized the parties were at an impasse, and upon advice of counsel, he offered to move on to other agenda items. He indicated that if Casillas would not move on, he would end the session. Casillas chose to continue the discussion on the grievance procedure knowing that Merringer would not.

Merringer did not terminate the bargaining session in bad faith or in an attempt to control the topics for discussion. The parties had other agenda items to discuss. Under the circumstances, Merringer did not act unreasonably by suggesting they move on to a different topic. Further, asking Conill to schedule another meeting evidenced the County's willingness to continue bargaining at a later time.

The Guild argues that there were a series of questionable acts which, when viewed as a whole, demonstrated a lack of good faith bargaining. However, when each contention is viewed

15

within the totality of the circumstances, the evidence does not support a conclusion that the County interfered with the Guild's rights or refused to engage in collective bargaining. We, therefore, conclude that PERC did not err in concluding that the County did not commit an unfair labor practice.

III.     PERC'S APPLICATION OF ITS PROCEDURE & RULES

The Guild argues that in addition to the substantive merits of this case, PERC failed to adhere to its own procedures and rules. It argues that PERC disregarded its standard of review when it conducted a de novo review of the facts, and that PERC ignored its own rules when it determined that the County met its burden of proof in challenging the hearing examiner's factual findings. We conclude that PERC acted properly in applying its procedures and rules.

A.     LEGAL STANDARDS

PERC reviews conclusions and applications of law, as well as interpretation of statutes, de novo. *Teamsters Local 117 v. Port of Seattle*, No. 24667-U-12-6305, at 1 (Wash. Pub. Emp't Relations Comm'n Mar. 17, 2014). Findings of fact are reviewed to determine if they are supported by substantial evidence and, if so, whether those findings in turn support the examiner's conclusions of law. *C-Tran, Emp'r – Daniel Duringer v. Amalgamated Transit Union, Local 757*, No. 14872-U-99-3746, at 5 (Wash. Pub. Emp't Relations Comm'n Jan. 8, 2002). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *C-Tran*, No. 14872-U-99-3746, at 5.

PERC attaches considerable weight to the factual findings and inferences, including credibility determinations, made by its hearing examiners. *Cowlitz County Jail Emps. Guild v. Cowlitz County*, No. 14229-U-98-3529, at 3 (Wash. Pub. Emp't Relations Comm'n 2000). "This

16

deference, while not slavishly observed on every appeal, is highly appropriate in fact-oriented appeals." *C-Tran*, No. 14872-U-99-3746, at 5.

PERC determines an appeal "on the basis of the record and any briefs or arguments submitted to it." WAC 391-45-390. The appealing party is required to identify the specific rulings, findings of fact, conclusions of law, or orders claimed to be in error in its notice of appeal. *Wash. Pub. Emps. Ass'n, UFCW Local 365 v. Cmty. Coll. Dist. 13*, No. 17397-U-03-4511, at 3 (Wash. Pub. Emp't Relations Comm'n Apr. 13, 2005); WAC 391-45-350(3). The party assigning error has the burden of showing a challenged finding is in error and not supported by substantial evidence. *Brinnon Educ. Ass'n v. Brinnon Sch. Dist.*, No. 13847-U-98-3395, at 5 (Wash. Pub. Emp't Relations Comm'n Oct. 9, 2001). Unchallenged findings of fact are considered verities by PERC on appeal. *Pub. Sch. Emps. of Wash. v. Cent. Wash. Univ.*, No. 23263-U-10-5930, at 2 (Wash. Pub. Emp't Relations Comm'n Aug. 3, 2012).

B.    FAILURE TO FOLLOW ITS STANDARD OF REVIEW

The Guild argues that PERC afforded no deference to the hearing examiner's factual findings, inferences, and credibility determinations. In support of its argument, the Guild points out that PERC mentions the examiner's findings only twice in its decision and argues that this fact shows a lack of deference to the examiner's findings. It also argues that by failing to discuss whether the examiner's findings were supported by substantial evidence, PERC "took it upon itself to review the entire record, anew, and make its own factual determinations as to what had occurred." Resp't's Br. at 35-36.

The Guild cites to several examples of the alleged error. It first claims that the County failed to reach a tentative agreement on the ground rules because it needed to consult with others not present at the bargaining table. Then it states that Conill's lack of knowledge about the

County's new resolution regarding overtime pay showed that he did not have authority to bargain. Lastly, it states that, regarding the grievance procedure, the County negotiated in bad faith or in a manner designed to frustrate bargaining. We disagree with the Guild.

As the Guild correctly notes, PERC did not state in its decision that the hearing examiner's factual findings were unsupported by evidence. Because the County's assigned errors were unsupported by argument, PERC presumably considered the unchallenged findings of fact verities on appeal.

Further, a review of the hearing examiner's factual findings and PERC's factual findings show that PERC did not materially change or dispute the examiner's findings. The Guild's examples show that from PERC's review of the hearing examiner's decision, PERC seems to have concluded that the examiner's factual findings—while supported by substantial evidence—did not in turn support the examiner's conclusions of law.

PERC did vacate some of the hearing examiner's factual findings; however, PERC is entitled to substitute its findings for those of the hearing examiner. *Yakima Police Ass'n*, 153 Wn. App. at 552. PERC's findings are not opposite or inconsistent with the hearing examiner's findings, nor did its substituted findings materially change any evidence. Rather, PERC afforded the examiner's findings appropriate weight. *Cowlitz County Jail Emps. Guild*, No. 14229-U-98-3529, at 3.

PERC reviewed the same evidence that the examiner heard. It applied the law to the facts and seemed to find that substantial evidence did not support the hearing examiner's conclusion that the County failed to bargain in good faith. Therefore, we conclude that PERC did not review the hearing examiner's factual findings de novo and properly applied its standard of review.[3]

C.   FAILURE TO HOLD THE COUNTY TO ITS BURDEN OF PROOF

The Guild argues that PERC erroneously concluded that the County, whose appeal brief it did not consider, met its burden of proof in challenging the hearing examiner's factual findings. We disagree with the Guild.

PERC rejected the County's appeal brief, but it considered all other "evidence and argument *properly* placed before it." AR at 6 (emphasis in original). That evidence and argument included the County's post-hearing brief submitted to the hearing examiner, which provided argument on essentially the same issues the County raised on appeal. PERC made no conclusion that the hearing examiner's factual findings were not supported by substantial evidence. Given this, PERC considered the factual findings as verities on appeal. PERC substituted facts already existing in the record that supported its legal conclusion, and omitted facts irrelevant to its legal conclusion. Its findings were not inconsistent with the hearing examiner's findings, nor did they materially change any evidence.

---

[3] It was unclear in the Guild's opening brief whether it also challenged PERC's factual findings for substantial evidence. The Guild's reply brief seemed to clarify: "This appeal is not about reviewing [PERC's] facts. It is about a legal issue—as a *legal* matter, [PERC] must follow its own established procedures." Resp't's Reply at 7 (emphasis in original). Therefore, the Guild is not asking us to review PERC's findings of fact; instead, it is asserting that PERC failed to follow its own procedures and adhere to its standard of review.

The Guild relies on PERC's decision in *Brinnon School District*, No. 13847-U-98-3395, where PERC noted that the appellant assigned error to multiple findings of fact, but did not address the listed findings. Because the party did not show how the hearing examiner's findings of fact were in error, PERC ruled that it did not meet its burden and treated the findings as verities. That situation is different from the one presented to us.

Therefore, we conclude that PERC properly held the County to its burden of proof.

We reverse the superior court, and affirm PERC.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, A.C.J.

_____
Lee, J.