# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| REYNALDO S. VERDUZCO, | No.  57052-1-II |
| Respondent/Cross-Appellant, | |
| v. | |
| KING COUNTY, WASHINGTON, | UNPUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

LEE, J. — King County (County) appeals a judgment following a jury trial in favor of Reynaldo Verduzco on the basis of retaliation[1] under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW.  Specifically, the County seeks a reversal and remand for a new trial based on (1) erroneous jury instructions, (2) juror bias, (3) improper witness exclusion, (4) excessive emotional distress damages, and (5) cumulative error.  Verduzco cross-appeals on the basis of the trial court's attorneys' fee award; specifically, Verduzco asserts the trial court erred when it reduced his attorneys' lodestar rates and deducted 20 percent from the fee award overall based on Verduzco's unsuccessful claims.

Because the trial court provided jury instructions that were confusing and misleading to the jury, we reverse and remand the issue of retaliation for a new trial.  Because we reverse and remand for a new trial, we do not reach the remaining issues on appeal or cross-appeal.

---

[1]  Verduzco also filed race discrimination and disability discrimination claims against the County that the jury found was not supported by the evidence.  The jury's findings on these claims are not challenged on appeal.

FACTS

A.    BACKGROUND

Verduzco, a Latino man, works in the Hazardous Waste Unit of the County's Hazardous Waste Program. The Hazardous Waste Program operates using a "matrix" system. 7 Verbatim Rep. of Proc. (VRP) (Apr. 26, 2022) at 747. The Hazardous Waste Program matrix is a "regional partnership" comprised of the County's Department of Natural Resources and Parks (DNRP)-Solid Waste; DNRP-Water and Land Resources; Seattle Public Utilities; and Seattle and King County Public Health. Ex. 84, at 8.

County employees receive annual performance appraisals. In the Hazardous Waste Unit, as part of the Washington State Council for County and City Employees Local 1652R (Local 1652R) collective bargaining agreement (CBA), employees' annual performance appraisals are based on quarterly reviews.

Verduzco has worked for the County since 1992. He is a member of Local 1652R. Throughout much of Verduzco's tenure with the County, he has received good performance appraisals.

In 2012, Verduzco was selected to fill in for his then-supervisor, David Galvin, when Galvin took a six-week leave. Verduzco performed well in the role and received a letter of commendation from Joan Lee, the rural and regional services section manager of DNRP-Water and Land Resources. Lee is three levels above Verduzco in the management structure. Lee is a white woman.

In 2015, Verduzco was selected to be the project manager of the Auto Paints Project team within the Hazardous Waste Program. At the time, the Hazardous Waste Program was undergoing a reorganization, which narrowed down the number of projects the program focused on. After Verduzco was selected as project manager for the Auto Paints team, the County received a complaint that Verduzco was misogynistic and had been selected for the position in part because of his race. As a result of the complaints, the County retained MFR Law Group to conduct an investigation into the allegations.

Around the time of the complaints, Galvin attempted to discuss an annual performance appraisal with Verduzco. Galvin prepared a draft appraisal and intended to discuss both positive performance and "constructive suggestions." 14 VRP (May 9, 2022) at 1785. Galvin's draft appraisal included comments Galvin had heard from "as many as half a dozen or more" employees "who were unhappy with the way Mr. Verduzco was interacting with them." 14 VRP (May 9, 2022) at 1786-87. Galvin noticed that the employees who made the comments about Verduzco all happened to be female. Galvin also wanted to inquire into Verduzco's perspective of those comments. Additionally, Galvin intended to involve Human Resources (HR) since the comments came from so many individuals, not just a single person. According to Galvin, to involve HR for such a situation was standard protocol for the County.

However, shortly after Galvin's meeting with Verduzco began, Verduzco became "very angry" about the comments that Galvin had included in the draft appraisal. 14 VRP (May 9, 2022) at 1785. Verduzco refused to sit down and left the meeting. Galvin did not see Verduzco for the remainder of the day. According to Verduzco, Galvin had threatened him with discipline because

of the comments and Verduzco left the meeting, invoking his *Weingarten*[2] rights. The threat of discipline, per Verduzco, was "being told [he] was going to be investigated and investigations can end up being—can end up with terminations, which is discipline." 12 VRP (May 4, 2022) at 1548.

Galvin sent Verduzco a follow-up email after the performance appraisal meeting. The email stated:

> Rey — We met at 3 p.m. today for a performance review discussion and to cover the annual performance summary that we turn in this time of year. I had prepared two documents, both based on the outline we use as spelled out in the local CBA:
>
> - A quarterly review, which you helpfully provided input to regarding a brief summary of your work in Q1-Q3; and
> - An annual performance summary.
>
> Both were and still are drafts. I had hoped that we could talk through the feedback issues that I wanted to bring to your attention. My hope was, and still is, that you can be open to hearing feedback regarding the way I and other co-workers perceive your behavior, and to do so in a calm and professional manner.
>
> However, today you did not allow me to go through the feedback I wished to discuss with you. You raised your voice, crossed your arms, stood up and launched into what I would describe as an outburst, and then walked out of my office 10 minutes into our hour-scheduled meeting time without allowing me even a chance to say anything in response or to steer us back to the subject at hand. The subject of today's meeting happened to be about performance issues.
>
> Please note: I consider your behavior today, in my office, from 3:00 to 3:10 p.m., as unprofessional, confrontational and contrary to our norms. It is ironic, since this very type of reactive, confrontational behavior is exactly what I had hoped to discuss with you today in order to point out how it affects your ability to interact with co-workers. My attempt at providing you some feedback today is not about the content, the "what", not with ESJ nor with equity in hiring. It's about the "how" regarding your behavior. I'm trying to help you to see how such behavior as you

---

[2] *See generally Nat'l Lab. Rel. Bd. v. J. Weingarten, Inc.*, 420 U.S. 251, 267, 95 S. Ct. 959, 43 L. Ed. 2d 171 (1975) (*Weingarten* rights refers to an employee's "right of union representation at investigatory interviews" with employers in which the employee "reasonably believes may result in disciplinary action against him.").

exhibited in my office today is not appropriate in any professional workplace, not in King County and not in our office at Canal Place.

Ex. 219. Verduzco replied to Galvin's email with the following:

I ended the meeting because I realized that I needed to invoke my Weingarten rights; meaning that I needed union representation. Additionally, I disagree with your characterization of our meeting. I asked you questions and you did not answer. You simply gave me documents to read. When I asked you about the "what, when, and where" you did not respond.

Ex. 219.

Verduzco also contacted Pamela Johnson, the HR Manager for the DNRP-Water and Land Resources, regarding who made complaints against him and the investigation of those complaints. Johnson informed Verduzco that it was a confidential process. Verduzco then made complaints of a hostile work environment and race discrimination, harassment, and retaliation.

As a result of Verduzco's complaints, MFR Law Group expanded the scope of its investigation to also investigate Verduzco's claims. The final report from MFR Law Group (Fleming Reed Report) concluded that Verduzco had not engaged in misogynistic conduct towards women and that Verduzco was not discriminated against, harassed, or retaliated against.

B.    2018 AND 2019 INCIDENTS

1.    2018 Incident with Lee

In 2018, Verduzco took part in a call where Lee was on speaker phone. Lee had limited time between meetings, so she stated that those on the call "needed to be quiet and listen, this was not the time to respond." 16 VRP (May 11, 2022) at 2288.

Verduzco, who wears hearing aids, couldn't understand what Lee was saying via speaker phone because "the sound was garbled and a little distorted." 12 VRP (May 4, 2022) at 1461.

According to Verduzco, he attempted to ask Lee why she was so upset, but Lee told him "to not say a word, to just listen to what she had to say, to go away and think about it and then maybe have a conversation later." 12 VRP (May 4, 2022) at 1461. Verduzco was "stunned" and "embarrassed." 12 (May 4, 2022) at 1461. According to Lee, she was "heated" on the call and it "was an intense conversation"; however, she felt she was raising an issue with her employees that was her prerogative to raise. 6 VRP (Apr. 25, 2022) at 512. Others who participated in the call described Lee as upset and stern on the call, but not yelling, and only discussed Lee's concerns about the hiring process. The conversation was no longer than 5 to 10 minutes.

Verduzco was very upset after the call and believed that Lee treated him "like a dumb Mexican." 12 VRP (May 4, 2022) at 1461. Verduzco felt that "'[t]his is what racism looks like.'" 16 VRP (May 11, 2022) at 2293.

That afternoon, Verduzco sent an email to Christie True, Director of the County DNRP. Verduzco copied several individuals on the email, including Lee's direct supervisor. The email subject line stated: "Joan Lee's Emotional and Verbal Racist/Sexist Micro-aggression toward Rey Verduzco and Alice Chapman." Ex. 18, at 1. In the email, Verduzco wrote that Lee "proceeded to emotionally and verbally abuse" him and that Lee "yelled, berated, and intimidated [him] over the phone. [Verduzco] characterize her behavior as racist toward [him]." Ex. 18, at 1. Verduzco also wrote: "I felt I was being emotionally and verbally assaulted and subjected to a stereotypical and racist response by a white woman towards a Latino man." Ex. 18, at 1.

Verduzco concluded his email with the following:

[T]he racism perpetrated by white women toward men of color is a pattern in [the DNRP-Water and Land Resources]. This is the third micro-aggression I've been subjected to in the last month alone. . . . My question to you Christie is when is this

6

going to stop?  What are you going to do to ensure that your employees are not subjected to racist and sexist behavior by colleagues and leadership?

Ex. 18, at 2.

When Verduzco sent his email, Lee had been in the process of writing a follow-up email to Verduzco about the phone call.  Lee sent the email, which listed the primary takeaways she wished for Verduzco to understand.  Following Verduzco's email, Lee replied-all and apologized that the individuals on the email were "brought into [the] situation."  Ex. 19, at 1.  Lee was "horrified, embarrassed[,] and sad" about the email.  7 VRP (Apr. 26, 2022) at 753.

2.      2019 Incidents

In 2019, following events involving Verduzco at a September 17 meeting, a September 18 conference, and other claims, the County initiated investigations, which culminated in three reports: the Abbott Report, the Belnavis Report, and the Greenlee Report.  The Abbott Report, issued on October 9, specifically investigated Verduzco's actions on September 17 and 18.  At issue was whether Verduzco violated County policy regarding "inappropriate communication."  Ex. 276, at 1.  Rob Abbott, who conducted the investigation, is a County employee, but works in a different division.  The Abbott Report made the following finding:

> There is enough independent testimony from employees within the organization and external employees . . . to conclude that Verduzco did indeed act inappropriately.  This included angry, accusatory, firm and loud interactions that were inappropriate in his discussions with [his] [s]upervisors . . . on September 17th and on September 18th with [his supervisor], at the GARE conference in Portland, Oregon.  With Verduzco's own admission that he "dropped the F bomb a few times,["] and raised his voice.  I have to conclude that Verduzco['s] behavior was inappropriate on both occasions, based on the number of witnesses reporting the same behaviors.

Ex. 276, at 7.

On October 24, 2019, the County placed Verduzco on administrative leave with pay. The letter notifying Verduzco of his administrative leave stated in part: "This action is being taken as a result of allegations which will be investigated regarding inappropriate and concerning behavior. You will remain on administrative leave until further notice." Ex. 51, at 1. However, the letter did not provide further detail. Verduzco did not understand why he was placed on administrative leave.

After Verduzco was placed on administrative leave, Canal Place changed its door codes. It was policy for the County to change door codes any time an employee left or if there were safety concerns.

Several incidents contributed to the decision to place Verduzco on administrative leave and to change the door codes, including a parking incident in June 2019, and Verduzco's interactions with his supervisors on September 17 and 18. Additionally, in early October 2019, there were a series of anonymous letters sent to the County about Verduzco which caused concern, including one that Verduzco was dangerous and owned a gun. The decision to place Verduzco on leave was made jointly "in consultation" with the Director's Office and HR. 14 VRP (May 9, 2022) at 1851.

C.    GREENLEE AND BELNAVIS REPORTS AND 2018-19 ANNUAL PERFORMANCE APPRAISAL

Following receipt of the anonymous letters about Verduzco, the County initiated another investigation, conducted by Jennifer Greenlee, resulting in the Greenlee Report. The anonymous letters alleged that (1) Verduzco had created a hostile work environment "in violation of the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy"; (2) Verduzco owned a gun; and (3) Verduzco discriminated and retaliated against a team member on the Business Services team by removing her job duties. Ex. 278, at 1.

8

Greenlee interviewed 14 individuals and reviewed several documents. The Greenlee Report concluded that Verduzco did not violate any County policies, but did violate the "Color Brave Space Norms[3] found in the Business Services Team contract and the Values and Norms for King County's Hazardous Waste Management Unit found in the Master Labor Agreement Appendix B."[4] Ex. 278, at 1. Regarding whether Verduzco owned a gun, the Greenlee Report stated that no witness could confirm that Verduzco owned a gun and that Verduzco had said the allegation was "'completely made up.'" Ex. 278, at 4.

Finally, the County conducted a third investigation regarding Verduzco's claims that he had been discriminated against based on his race and hearing disability. The County retained an outside firm, Fisher Phillips, to conduct the investigation, which culminated in the Belnavis Report. The investigator did not find any evidence of adverse treatment against Verduzco based on his race or disability. However, the report stated:

> I believe that the current working environment is significantly damaged in that Mr. Verduzco's peers do not want to interact with him because they perceive him to be a bully who yells or belittles them when he does not get his way. While he believes that they are afraid of him because of their stereotype of him as an aggressive Hispanic male, they appear to believe that his conduct is inappropriate and unprofessional irrespective of his background. As a result, no one is communicating effectively in the work unit.

Ex. 277A at 1.

---

[3] Ex. 260, at 8-11. The Color Brave Space Norms are a code of conduct that the Business Services team has specifically adopted.

[4] *See* Ex. 291. The County "Key Values and Norms" encourage employees to be "Fair," "Open and Honest," "Professional," "Respectful," "Collaborative," "Risk-Taking," and "Caring and Fun." Ex. 291, at 1-4.

Both the Greenlee and Belnavis Reports were finalized in December 2019 while Verduzco was on administrative leave.

Verduzco's supervisors prepared and reviewed a 2018-2019 annual performance appraisal for Verduzco, which covered September 1, 2018 to August 31, 2019. For the first time in Verduzco's career with the County, he was rated "Below Standard" in various performance categories, specifically those of "Fairness," "Respect," and "Care and fun." Ex. 28, at 1. Generally, the performance appraisal noted that Verduzco produced satisfactory work as the project manager of the Business Services team. However, Verduzco struggled with communication, relationship building, and professionalism. The performance appraisal also attached a letter of expectations that Verduzco's supervisor had sent Verduzco in May 2019. Based on the below standard ratings, Verduzco's supervisors did not recommend that Verduzco receive a "'merit over top'" raise. 9 VRP (Apr. 28, 2022) at 1083. Verduzco stated that he did not agree with the contents of the performance appraisal and wished to appeal.

D.      SUSPENSION

On October 28, 2019, Lee proposed that Verduzco be suspended without pay for five days. Lee proposed the suspension based on the incidents in September and on the Abbott Report findings. The decision to suspend Verduzco was made after consultation with the Director's Office, HR, and the prosecuting attorney's office.

The letter proposing suspension without pay notified Verduzco that he could appeal the decision. Verduzco appealed. As part of the appeal process, Verduzco had the opportunity to share his perspective.

Verduzco's suspension was upheld. The letter upholding Verduzco's suspension provided detailed reasons for the decision, including the fact that Verduzco "did not take ownership for any part of the discord" of the September incidents. Ex. 321, at 1. The suspension ran from December 16, 2019 through December 20, 2019.

E.      VERDUZCO'S RETURN TO WORK

When Verduzco returned after his suspension, his job duties changed despite retaining the same project manager classification and same pay rate. Specifically, Verduzco no longer managed a team or budget; instead, Verduzco was assigned "mini projects" to work on independently. 7 VRP (Apr. 26, 2022) at 855. Furthermore, Lee directly supervised Verduzco upon his return. Verduzco felt that the change in job duties was humiliating. He believed he was doing the "work of an intern," and he had "no lead responsibility" and "less prestige." 12 VRP (May 4, 2022) at 1482.

In April 2020, Verduzco wanted to apply for an "Emergency Site Worker IV" position, which had a higher role classification. 12 VRP (May 4, 2022) at 1459. Verduzco wanted to apply in part because it would remove him from Lee's scrutiny and help him "get back on track for being a supervisor." 12 VRP (May 4, 2022) at 1460. Verduzco needed Lee's permission to apply, so he sought permission from Lee.

Lee had concerns that it was only Verduzco's second week back at the County after his administrative leave and that Verduzco might not be able to handle the stress and emotion of the emergency worker position. At the advice of HR, Lee responded to Verduzco's request with the following:

It is good hearted of you to want to pitch in and help.

11

> For me to approve, I would want to understand what has changed in your approach to colleagues from last year to now that would allow me to commend you for work in difficult situations with high emotional stress.

Ex. 281, at 1. Verduzco replied, "I don't agree with your concerns. I withdraw my request." Ex. 281, at 1.

Verduzco believed that Lee created barriers for him upon his return. Based on Verduzco's view of Lee's conduct, Local 1652R threatened to file domination and interference charges against Lee. However, Local 1652R never did so.

Verduzco's 2019-2020 Annual Performance Appraisal covered September 1, 2019 through August 31, 2020. Verduzco again received below standard ratings under the "Fairness," "Professionalism," and "Respect" categories. Ex. 83, at 1. This was based on the fact that Verduzco was placed on administrative leave between October 2019 and March 2020, a subsequent supervisor's letter of expectations to Verduzco, the findings of the Greenlee and Belnavis Reports, and Verduzco's December 2019 suspension. As a result, Verduzco's supervisor did not recommend that Verduzco receive a merit over top raise.

In Verduzco's 2020-2021 Annual Performance Appraisal, he received standard or above ratings for all categories and overall, his performance was "outstanding." Ex. 90, at 3. Verduzco did not qualify for a merit over the top raise because of the below standard ratings on his prior two appraisals.

F.  PROCEDURAL HISTORY

In October 2020, Verduzco filed a complaint against the County alleging race discrimination, retaliation, and disability discrimination, all in violation of the WLAD, chapter

49.60 RCW.  Verduzco requested a jury trial.  The trial began in April 2022.  Following a month-long trial, the jury found in favor of Verduzco on his retaliation claim, but not on his claims of race or disability discrimination.

1.      Jury Instructions

During the pretrial conference, the trial court requested both parties propose jury instructions.  The court ordered Verduzco to make initial proposals and the County to respond with any desired changes.

Verduzco and the County disagreed over the jury instruction defining "adverse."  Verduzco proposed:

> An adverse employment action is a change in employment that is more than an inconvenience or alteration of one's job responsibilities.  The employee must show that a reasonable employee would have found the challenged action(s) materially adverse, meaning that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination and/or retaliation.  Whether an action is materially adverse depends upon the circumstances of the particular case and should be judged from the perspective of a reasonable person in the Plaintiff's position.

Clerk's Papers (CP) at 1160.  Verduzco's instruction combined Washington Pattern Jury Instruction (WPI) 330.06, which defines "adverse" in retaliation claims, and WPI 330.01.02, which defines "adverse" in the context of discrimination claims.  *See generally* 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.06, at 343 (7th ed. 2018) (WPI); 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.01.02, at 328 (7th ed. 2018).

The County objected to the instruction based on the risk of creating jury confusion such that the jury would apply both meanings of "adverse" in the incorrect context. Instead, the County proposed its own instruction defining "adverse," which stated:

> In a discrimination disparate treatment case,
>
> An adverse employment action is one that materially affects the terms, conditions or privileges of employment. An action must involve a change in employment that is more than an inconvenience or alteration of one's job responsibilities.
>
> The definition above applies to a discrimination disparate treatment claim. In a claim of retaliation, the term "adverse" means unfavorable or disadvantageous. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination. Whether a particular action is adverse is judged from the perspective of a reasonable person in the plaintiff's position.

CP at 3236.

Verduzco's counsel argued that the clarification was not necessary and that Verduzco's proposed instruction merely followed direction given in WPI 330.06, which states to combine the instructions when both disparate treatment and retaliation claims are involved. WPI 330.06, at 343.

The trial court agreed with Verduzco's counsel: "It is a correct statement of the law. I don't think it causes confusion." 15 VRP (May 10, 2022) at 2001.

The County also objected to Verduzco's proposed instruction regarding subordinate bias liability in retaliation claims. Verduzco's proposed instruction stated: "If a supervisor performs an act motivated by retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation." CP at 2543. The County

argued that the instruction was not found in the Washington Pattern Jury Instructions; instead, the instruction was found only in case law, and furthermore, the facts of Verduzco's case did not support giving such an instruction.

The trial court inquired whether the instruction was a correct statement of the law. The County responded affirmatively, and the trial court decided that the subordinate bias liability instruction would be given.

The final jury instructions included Instruction No. 8, which provided:

> The term "adverse" means unfavorable or disadvantageous. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination. Whether a particular action is adverse is judged from the perspective of a reasonable person in the [sic] Mr. Verduzco's position. An adverse employment action is one that materially affects the terms, conditions, or privileges of employment.

CP at 2542. Instruction No. 9 provided:

> If a supervisor performs an act motivated by retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation.

CP at 2543.

2.      Jury Verdict

The jury found in favor of Verduzco on his retaliation claim. The jury did not find for Verduzco on his race and disability discrimination claims.

The jury awarded Verduzco $2,135.07 in past lost wages, $40,000 in future lost wages, and $27,988.31 in lost pension benefits. The jury also awarded Verduzco $2,000,000 in emotional distress damages.

3.      Motion for New Trial

In June 2022, the County filed a motion for a new trial "based on irregularity in the proceedings." CP at 2607. Specifically, the County asserted that the trial court abused its discretion in denying the County's for-cause and peremptory challenges, the emotional damages award was excessive suggesting passion and/or prejudice, the jury instructions were erroneous, and the trial court erred in excluding the County's economic expert, among other issues. The trial court denied the County's motion for a new trial.

4.      Attorneys' Fee Award

Following the trial, Verduzco moved for attorney fees and costs. Verduzco sought a total of $1,190,610.46. The total included a lodestar rate of $550 per hour for attorney Susan Mindenbergs, $500 per hour for attorney Vonda Sargent, a lodestar multiple of 1.25 for both Mindenbergs and Sargent, and $175 per hour in paralegal fees. Mindenbergs and Sargent represented Verduzco on a contingency fee basis.

The trial court awarded Mindenbergs and Sargent $350 per hour. The trial court also added a 25 percent multiplier based on Mindenbergs' and Sargent's skill and experience, but then deducted the overall fee award by 20 percent for Verduzco's unsuccessful claims. The trial court entered a judgment for Verduzco incorporating the fee award.

Verduzco filed a motion for reconsideration of the trial court's reduction in the lodestar rates. The trial court denied the motion.

The County appeals. Verduzco cross-appeals on the issue of attorney fees.

ANALYSIS

The County argues several trial court errors warrant reversal and a remand for a new trial. Specifically, the County argues the trial court erred (1) in giving erroneous jury instructions, (2) when it denied the County for-cause and peremptory challenges against a juror, (3) when it excluded the County's expert witness, and (4) when it denied the County's motion for a new trial based on excessive noneconomic damages. The County further argues that the combination of errors together merit reversal under the cumulative error doctrine.

A.     JURY INSTRUCTIONS

The County argues that Instruction 8 and Instruction 9 were erroneous. Specifically, the County asserts that Instruction 9, the subordinate bias liability—or "cat's paw"[5]—instruction "is not supported by the evidence or the law." Br. of Appellant/Cross-Resp't at 29. Additionally, the County argues that Instruction 8, the definitional instruction for the term, "adverse," was misleading and confusing for the jury. Verduzco argues that neither instruction was erroneous. We agree with Verduzco that Instruction 9 was proper. However, we agree with the County that Instruction 8 was misleading and confusing for the jury.

1.     Legal Principles

Jury instructions must allow counsel to argue their theory of the case, must not be misleading, and must properly inform the trier of fact of the applicable law. *Walter v. Spee W. Constr. Co.*, 21 Wn. App. 2d 204, 209-10, 504 P.3d 878 (2022). We review alleged errors of law in jury instructions de novo. *Id.* at 210. However, if a challenge to a jury instruction is based upon

---

[5] The phrase "cat's paw" originated from the fable "The Monkey and the Cat" by Jean de la Fontaine. *Boyd v. State*, 187 Wn. App. 1, 6 n.1, 349 P.3d 864 (2015).

a matter of fact, "[w]e review the language and wording of jury instructions for abuse of discretion." *Tisdale v. Apro, LLC*, 25 Wn. App. 2d 47, 56, 522 P.3d 116 (2022).

"Where substantial evidence supports a party's theory of the case, trial courts are required to instruct the jury on the theory." *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 767, 389 P.3d 517 (2017). Substantial evidence is evidence that rises above speculation and conjecture and "we view the evidence in the light most favorable to the party requesting the instruction." *Walter*, 21 Wn. App. 2d at 210. An erroneous instruction is reversible error where it prejudices a party. *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 948, 509 P.3d 306, *review denied*, 200 Wn.2d 1015 (2022). While typically the party challenging the instruction bears the burden of demonstrating prejudice, prejudice is presumed when the instruction misstates the applicable law. *Id.* at 948-49.

The WLAD prohibits employers from retaliating against employees who engage in WLAD-protected activities. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018); *see* RCW 49.60.210. "An employee engages in WLAD-protected activity when he opposes employment practices forbidden by antidiscrimination law or other practices that he reasonably believed to be discriminatory." *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 754, 315 P.3d 610 (2013).

To establish a prima facie case of retaliation under the WLAD, an employee must "show three things: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell*, 192 Wn.2d at 411. If the employee can show a prima facie case of retaliation, then the burden shifts to the employer to articulate evidence of a legitimate, nondiscriminatory reason for the adverse action. *Boyd v. State*, 187 Wn. App. 1, 12,

349 P.3d 864 (2015). "The burden then shifts back to the employee to show that the employer's reason is pretext." *Id.*

An adverse action "involves a change in employment conditions that is more than an inconvenience or alteration of one's job responsibilities, such as reducing an employee's workload and pay." *Alonso*, 178 Wn. App. at 746. Demotions, adverse transfers, or hostile work environments may be considered adverse actions. *Id.* A poor performance rating that results in termination and prevents rehire may also be an adverse action. *See Cornwell*, 192 Wn.2d at 415-16. An employee demonstrates causation if they can show that retaliation was a substantial factor motivating the employment decision. *Id.* at 412.

Under the subordinate bias liability theory, an employer is liable when a subordinate who lacks decision-making power uses their influence to trigger an adverse employment decision. *City of Vancouver v. Pub. Emp. Rels. Comm'n*, 180 Wn. App. 333, 351, 325 P.3d 213 (2014). In such cases, the subordinate's animus is imputed to the employer, and the employer is liable for retaliation. *Boyd*, 187 Wn. App. at 20. "[A] complainant seeking to use the subordinate bias theory of liability must show that the subordinate's animus was a substantial factor in the decision resulting" in an adverse employment action. *City of Vancouver*, 180 Wn. App. at 356.

WPI 330.01.02 defines "adverse" in the context of a discrimination claim based on disparate treatment as: "An adverse employment action is one that materially affects the terms, conditions or privileges of employment." WPI 330.01.02, at 328.

WPI 330.06 defines "adverse" in the context of a retaliation claim as:

> The term "adverse" means unfavorable or disadvantageous. An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of [discrimination] [harassment]

19

[and] [or] [retaliation]. Whether a particular action is adverse is judged from the perspective of a reasonable person in the plaintiff's position.

WPI 330.06, at 343 (brackets in original). In the note on use, WPI 330.06 directs users to combine the instruction with WPI 330.01.02 if a case also involves disparate treatment:

> If both disparate treatment and retaliation are involved, combine the instruction with WPI 330.01.02 (Employment Discrimination—Disparate Treatment—Adverse Employment—Definition) to differentiate adverse employment action in disparate treatment claims from adverse employment action in retaliation claims.

WPI 330.06 note on use at 343. The direction to combine the instructions but to differentiate between discrimination based on disparate treatment and retaliation claims arises from the United States Supreme Court decision in *Burlington Northern and Santa Fe Railway Co. v. White*, which distinguished between adverse employment actions in the context of retaliation claims and adverse employment actions in the context of discrimination claims. 548 U.S. 53, 67-68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Further, Washington courts have approved jury instructions that make such a distinction. *See Boyd*, 187 Wn. App. at 15.

    2.    Trial Court Did Not Err in Giving Instruction 9

The County argues that the trial court erred in giving Instruction 9 because the instruction is not supported by the evidence.[6] Specifically, the County asserts that Verduzco's theory of

---

[6] The County also argues that Instruction 9 is not supported by the law. However, the County's brief appears to primarily focus on whether substantial evidence supported the giving of Instruction 9 and does not clarify the error of law. At trial, the County had mounted a legal challenge to Instruction 9 because it was based only on case law rather than the Washington Pattern Jury Instructions. However, the County conceded that Instruction 9 correctly stated the law. The issue, then, is whether substantial evidence supports giving the instruction, which is reviewed for abuse of discretion. *Tisdale*, 25 Wn. App. 2d at 56. Accordingly, this opinion addresses only the substantial evidence argument as it pertains to Instruction 9.

case—that Lee's animus against Verduzco influenced decisions about Verduzco's employment—is not supported by the facts based on evidence. Verduzco argues the facts support a subordinate bias liability instruction.[7] We agree with Verduzco.

Instruction 9 states:

> If a supervisor performs an act motivated by retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer is liable for retaliation.

CP at 2543. Thus, for the County to be liable for Lee's conduct towards Verduzco, Verduzco must demonstrate that (1) Lee harbored animus against Verduzco, (2) Lee performed an act motivated by that retaliatory animus, (3) Lee intended the act to cause an adverse employment action for Verduzco, and (4) Lee lacked decision-making authority but her action was a substantial factor in the County's adverse employment action against Verduzco. *See Boyd*, 187 Wn. App. at 19-20.

Here, while the parties dispute the number of adverse actions that Verduzco was subjected to, the parties agree that Verduzco's suspension was an adverse action.[8]

---

[7] We note that as part of his argument that the subordinate bias liability instruction was proper, Verduzco argues for the first time that it was other supervisors, not Lee, who harbored animus against Verduzco and influenced management decisions. At trial, Verduzco emphasized Lee and Lee's influence. Thus, it appears that Verduzco argues an entirely different theory on appeal. However, even if Verduzco argues a new theory, it does not affect our analysis of whether Instruction 9 was proper.

[8] The County asserts that the only true adverse action was Verduzco's five-day suspension. Paid administrative leave, the County argues, is not considered discipline under the terms of Verduzco's CBA and when Verduzco returned from leave, he maintained his same job title, pay rate, and benefits, and merely had a change in job duties.

Verduzco, on the other hand, claims he was subjected to several adverse employment actions, including poor performance reviews, multiple investigations, a forced leave of absence,

As to whether Lee harbored animus towards Verduzco, the record shows that Verduzco publicly called out Lee for what he believed to be racist conduct. Lee was "horrified, embarrassed[,] and sad" about Verduzco's emails. 7 VRP (Apr. 26, 2022) at 753. Again, when Lee had direct supervision of Verduzco, her management style prompted Verduzco's union representative to threaten charges of domination and interference. Accordingly, an inference may arise that Lee harbored animus against Verduzco based on the public nature of Verduzco's December 2018 emails.

As to Lee's act being motivated by retaliatory animus, evidence of Lee's actions towards Verduzco when he returned from his administrative leave, making it exceedingly difficult for him to perform his job, raises an inference that Lee's suspension recommendation was the result of animus she harbored against Verduzco.

---

suspension, and "demotion," all because "he reasonably complained that an upper-level manager acted in a racist manner against him." Br. of Resp't/Cross-Appellant at 20.

Verduzco's placement on administrative leave could qualify as an adverse action: even though Verduzco was paid, it was an involuntary and significant change to his conditions of employment. *Alonso*, 178 Wn. App. at 746-47. When Verduzco was notified of the decision, he did not know if and when he was going to return, nor did he fully understand the reasons why he was placed on leave.

Similarly, when Verduzco first returned to work after his leave and was assigned directly under Lee, it was not merely a change in his responsibilities—rather, the way in which Lee structured Verduzco's position made it exceedingly difficult for Verduzco to complete his job and prompted Verduzco's union to threaten filing domination and interference charges. A hostile work environment may be considered an adverse action. *Alonso*, 178 Wn. App. at 747. However, regardless of the number of adverse actions alleged, the evidence clearly demonstrates at least one adverse action. Therefore, we need not opine as to whether the workplace investigations and Verduzco's poor performance reviews were also adverse.

As to whether Lee intended to cause adverse employment actions for Verduzco, the record shows that Lee made the recommendation to suspend Verduzco. Thus, there is evidence of Lee's intent to cause an adverse employment action that rises above speculation and conjecture.

As to Lee's decision-making authority and whether Lee's action was a substantial factor in the County's adverse employment action against Verduzco, the County is correct that Lee did not make many final decisions affecting Verduzco, such as determining that Verduzco would be placed on leave, upholding Verduzco's suspension, and upholding Verduzco's performance appraisal. However, while Lee was not a final decision-maker, Lee was, in many cases, involved in management conversations about Verduzco. Indeed, it was Lee who proposed that Verduzco be suspended without pay for five days. When the record contains reasonable but competing inferences of retaliation and non-retaliation, it is the jury's duty to choose between such inferences. *Boyd*, 187 Wn. App. at 12.

In the context of jury instructions, substantial evidence is evidence that rises above speculation and conjecture and it must be viewed "in the light most favorable to the party requesting the instruction." *Walter*, 21 Wn. App. 2d at 210. "Where substantial evidence supports a party's theory of the case, trial courts are required to instruct the jury on the theory." *Taylor*, 187 Wn.2d at 767. Here, viewing the evidence in a light most favorable to Verduzco, there is evidence in the record that rises above speculation and conjecture to warrant the subordinate bias liability instructions. Therefore, we hold that the trial court did not abuse its discretion in giving Instruction 9.

No. 57052-1-II

3.    Trial Court Erred in Giving Instruction 8

The County also argues that the trial court erred in giving Instruction 8, which defined the term "adverse."  Specifically, the County contends that the instruction failed to distinguish "adverse" in a discrimination context from "adverse" in a retaliation context and gave no direction to the jury as to which definition applied to which claim.  We agree.

At issue in Instruction 8 is whether the trial court properly informed the jury of the correct legal standard; therefore, we review whether Instruction 8 was erroneous de novo.  *Walter*, 21 Wn. App. 2d at 210.

Instruction 8 states:

> The term "adverse" means unfavorable or disadvantageous.  An employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making a complaint of discrimination.  Whether a particular action is adverse is judged from the perspective of a reasonable person in Mr. Verduzco's position.  An adverse employment action is one that materially affects the terms, conditions, or privileges of employment.

CP at 2542.  The first three sentences come from WPI 330.06, which define adverse employment actions in the context of retaliation.  WPI 330.06, at 343.  The final sentence comes from WPI 330.01.02, which defines adverse in a discrimination context.  WPI 330.01.02, at 328.

The County argues that Instruction 8, read together with Instruction 10,[9] which defines the elements of retaliation, created the possibility for the jury to apply the "more generalized"

---

[9] Instruction 10 stated:

> It is unlawful for an employer to retaliate against a person for opposing what the person reasonably believed to be discrimination on the basis of race.
> To establish a claim of unlawful retaliation by Defendant King County, Washington, Plaintiff Reynaldo S. Verduzco has the burden of proving both of the following propositions:

discrimination definition of "adverse" applicable to disparate treatment claims—an action that affects the terms, conditions, or privileges of employment—to Verduzco's retaliation claim. Br. of Appellant/Cross-Resp't at 46. Instead, the jury's retaliation determination should be based on whether the adverse action was unfavorable, disadvantageous, or harmful to the point it would dissuade an employee from making a complaint. Specifically, the County points to Verduzco's administrative leave, an action that affected his conditions of employment but was not necessarily unfavorable or disadvantageous overall because he was paid for the duration of his leave and maintained his benefits and job.

Verduzco appears to argue that Instruction 8 either sufficiently differentiated between "adverse" in discrimination and "adverse" in retaliation, or the lack of differentiation in the instruction placed an additional burden on him to prove his case anyway. However, in his brief, Verduzco did not elaborate as to what his additional burden was and instead argues what constituted adverse employment actions generally.

---

(1) That Mr. Verduzco was opposing what he reasonably believed to be discrimination on the basis of race or retaliation; and

(2) That a substantial factor in the decision to discipline was Mr. Verduzco's opposing what he reasonably believed to be discrimination or retaliation.

If you find from your consideration of all of the evidence that both of these propositions [have] been proved, then your verdict should be for Mr. Verduzco on this claim. On the other hand, if any one of these propositions has not been proved, your verdict should be for King County on this claim.

Mr. Verduzco does not have to prove that his opposition was the only factor or the main factor in the King County's decision, nor does Mr. Verduzco have to prove that he would not have been disciplined but for his opposition.

CP at 2544.

25

Contrary to Verduzco's assertion, the note on use for WPI 330.06 does not instruct users to simply combine WPI 330.06 with WPI 330.01.02, but states that users should "combine the instruction with WPI 330.01.02 . . . to *differentiate* adverse employment action in disparate treatment claims from adverse employment action in retaliation claims." WPI 330.06 note on use at 343 (emphasis added). Here, Instruction 8 did not differentiate between the definitions of "adverse" in a disparate treatment claim and "adverse" in retaliation claim. The meaning of "adverse," depending on the context, has completely different standards. Further, Instruction 8 was immediately followed by Instruction 9 and Instruction 10, which were both related to retaliation. Merging the two standards, without distinction, to be applied to either claims of retaliation or discrimination becomes a misstatement of the law.

Given the lack of differentiation, the jury could well have applied the incorrect legal standard when it considered adverse actions in Verduzco's retaliation claim. Prejudice is presumed when the instruction misstates the applicable law. *Roemmich*, 21 Wn. App. 2d at 949. In his brief, Verduzco fails to make any argument as to why the instruction was not prejudicial to the County. During oral argument, Verduzco assumed that the jury looked both at unfavorable actions *and* material changes in his conditions of employment. Thus, he argues he had the greater burden and accordingly, there was no prejudice to the County. *See* Wash. Ct. of Appeals oral argument, *Verduzco v. King County*, No. 57052-1-II (Jan. 26, 2024), at 22 min., 5 sec. through 22 min, 32 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. However, we do not consider arguments raised for the first time during oral argument. *See State v. Kirwin*, 137 Wn. App. 387, 394, 153 P.3d 883 (2007), *aff'd*, 165 Wn.2d

818, 203 P.3d 1044 (2009). And even so, we simply cannot know how the jury applied the law, especially when given a misstatement of the law.[10]

Because Instruction 8 failed to distinguish between the different definitions of "adverse" applicable in retaliation and discrimination claims, it was misleading and did not properly inform the jury of the applicable law. *Walter*, 21 Wn. App. 2d at 210. Therefore, we hold that the trial court erred when it gave Instruction 8 to the jury, and we reverse and remand for a new trial on the issue of retaliation.

Because we reverse and remand to the trial court for a new trial, we do not reach the remaining issues on appeal or cross-appeal.

## ATTORNEY FEES ON APPEAL

Verduzco requests the award of attorney fees on appeal. Because we reverse and remand for a new trial, Verduzco is not the prevailing party. Accordingly, we deny Verduzco's request for attorney fees.

## CONCLUSION

Because the trial court erred when it gave Instruction 8 to the jury, we reverse the trial court and remand for a new trial on the issue of retaliation.

---

[10] For instance, Verduzco argues that Lee discriminated against him during a December 5 phone call. The proper standard to apply to a discrimination claim is whether the action is "one that materially affects the terms, conditions, or privileges of employment." CP at 2542. However, many may view being yelled at by a superior as unfavorable, such that it would dissuade an employee from making complaints of discrimination—which is the standard applied to retaliation claims. The upshot is that, as mentioned above, we cannot know what standard the jury applied to what claim or action.

No. 57052-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Veljacic, A.C.J.